694 F.2d 793
 224 U.S.App.D.C. 227
 UNITED STATES of America, Petitioner,
v.
FEDERAL MARITIME COMMISSION, Respondent,
Gulf-Kingdom Rate Agreement, Sea-Land Service, Inc.,
Japan/Korea-Atlantic and Gulf Freight, et al., Pacific
Westbound Conference, et al., Seatrain International, S.A.,
Pacific Coast European Conference, et al., Intervenors.
 No. 79-1299.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 10, 1981.
Decided Nov. 16, 1982.
As Amended Nov. 22, 1982.
 
 Robert J. Wiggers, Atty., Dept. of Justice, Washington, D.C., with whom Robert B. Nicholson and John Powers, III, Attys., Dept. of Justice, Washington, D.C., were on the brief, for petitioner. Barry Grossman, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for petitioner.
 C. Jonathan Benner, Gen. Counsel, Federal Maritime Com'n, Washington, D.C., with whom Edward G. Gruis, Deputy Gen. Counsel, Gordon M. Shaw and Carol J. Neustadt, Attys., Federal Maritime Com'n, Washington, D.C., were on the brief, for respondent.
 R. Frederic Fisher, San Francisco, Cal., with whom Charles L. Coleman, San Francisco, Cal., and Seymour H. Kligler, New York City, Pacific Westbound Conference, et al., David C. Nolan, San Francisco, Cal., Pacific Coast European Conference, et al., Charles F. Warren and George A. Quadrino, Washington, D.C., Japan/Korea-Atlantic and Gulf Freight Conference, et al., and Nathan J. Bayer, Atlantic and Gulf Panama Canal Zone, Calon and Panama City Conference, et al., Washington, D.C., were on the brief, for Conference intervenors.
 Donald J. Brunner, Edward M. Shea and Francis W. Fraser, Washington, D.C., were on the brief, for intervenor Sea-Land Service, Inc.
 Neal M. Mayer, Paul D. Coleman and David S. Healy, Washington, D.C., entered appearances for intervenor, Seatrain Intern., S.A.
 Before ROBINSON, Chief Judge, WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, and GINSBURG, Circuit Judges, and ROBB, Senior Circuit Judge.
 Opinion for the Court filed PER CURIAM.
 
 
 1
 Dissenting statement filed by Circuit Judge MacKINNON and Senior Circuit Judge ROBB.
 
 JUDGMENT
 
 2
 PER CURIAM.
 
 
 3
 This cause came on to be heard on a petition for review of an order of the Federal Maritime Commission, and was argued initially before a panel of this Court and subsequently before the Court sitting en banc.
 
 
 4
 On consideration of the foregoing, it is ORDERED by the Court en banc that the portion of the order entered herein on March 13, 1981, reading
 
 
 5
 FURTHER ORDERED by the Court en banc that the opinion and judgment of this Court entered on December 19, 1980, be, and the same hereby are, vacated.
 
 
 6
 be and hereby is amended to read as follows:
 
 
 7
 FURTHER ORDERED by the Court en banc that (a) Parts III and IV of the opinion of this Court filed on December 19, 1980, (b) Part V of said opinion to the extent that it recites the ruling made in Parts III and IV thereof, and (c) the judgment of this Court entered on December 19, 1980, to the extent that it implemented the ruling made in Parts III and IV of said opinion, be, and the same hereby are, vacated, all other portions of said opinion and judgment to remain in full force and effect.
 
 
 8
 and it is
 
 
 9
 FURTHER ORDERED by the Court en banc that the opinions of members of the panel, majority and dissenting, filed on December 19, 1980, be reproduced as an appendix to this judgment and the opinions accompanying it; and it is
 
 
 10
 ADJUDGED and FURTHER ORDERED by the Court en banc that the petition for review be and hereby is dismissed as moot; and it is
 
 
 11
 FURTHER ORDERED by the Court en banc that the order of the Federal Maritime Commission approving Agreement No. 10140-8--Extension of U.S. Gulf/United Kingdom Rate Agreement, dated August 30, 1978, and served January 19, 1979, be, and the same hereby is, vacated.
 
 PER CURIAM:
 
 12
 This litigation emanates from an order of the Federal Maritime Commission approving an agreement among six ocean carriers fixing, for two of them, overall through rates for inland transportation by rail or motor carrier as well as for transportation at sea. The order originally came on for review by a panel of this court, which (a) held unanimously that the Department of Justice, on behalf of the United States, had standing to attack the order and that its challenge was justiciable,[1] and (b) further held, by a majority vote, that the Commission was statutorily empowered to approve the agreement.[2] The panel was in accord on remand of the case for further administrative proceedings, though not upon the scope of the inquiry to be conducted.[3]
 
 
 13
 Two of the litigants thereafter suggested rehearing en banc: Sea-Land Service, Inc., of the holdings on standing and justiciability;[4] and the United States, of the holding on Commission authority.[5] We denied Sea-Land's suggestion,[6] thus leaving the panel's standing and justiciability rulings intact, and granted the United States' suggestion with a view to reexamining the question of Commission jurisdiction.[7] Our implementing order, however, directed overbroadly a vacatur of the panel's opinion and judgment, and not simply to the extent that they were to be reheard. We remedy that inadvertence by amending the order to make clear that the vacatur was limited to the panel's action respecting Commission power to approve the agreement.
 
 
 14
 Turning now to that aspect of the case, we find that the controversy regarding it is no longer alive. The agreement in question has expired, and no prospect of its revival is in sight. Although the Commission continually approves agreements of this sort, that, coupled with the fact that some such agreements have fairly long terms, assures ample opportunity for the United States to litigate the issue of Commission jurisdiction in some other case, as indeed it already is.[8] We accordingly dismiss the petition for review as moot, and vacate the Commission order precipitating it.[9]
 
 Statement of Judges MacKinnon and Robb
 
 15
 The en banc court has amended its order vacating the panel opinion and reinstates only that portion of the opinion addressing the standing and justiciability issues. (Parts I and II of the panel's opinion). That part of the panel's opinion regarding the Commission's power to approve an agreement among six ocean carriers setting shipping rates for intermodal routes has not been reinstated. The agreement, which required periodic renewal, was not renewed on March 1, 1981; thus, it expired by its own terms on that date. The en banc court concluded, therefore, that the controversy regarding the agreement was presently moot.
 
 
 16
 Judges MacKinnon and Robb respectfully dissent from the refusal to reinstate the entire panel opinion. The controversy regarding the Commission's power to approve the agreement was a live controversy when the panel opinion was rendered. We believe, therefore, that those portions of the panel's opinion dealing with this issue should also stand. (Parts III and IV).
 
 APPENDIX
 Argued March 13, 1980
 Decided December 19, 1980
 
 17
 Before MacKINNON, ROBB and WALD, Circuit Judges.
 
 
 18
 Opinion for the Court filed by Circuit Judge MacKINNON.
 
 
 19
 Opinion filed by Circuit Judge WALD, concurring in part and dissenting in part.
 
 MacKINNON, Circuit Judge:
 
 20
 The Antitrust Division of the Department of Justice (hereafter also referred to as the Department, or Justice) petitions under the Hobbs Act[1] for review of an order entered by the Federal Maritime Commission (hereafter referred to as the Commission or Maritime). The order approved a shipping rate agreement among six ocean carriers that, for two of the carriers, covers intermodal routes which involve movement by rail or motor vehicle as well as by sea. The Department contends that the Commission has no jurisdiction to approve rates pertaining in part to land carriage and that in any event it failed to hold an adequate hearing. Joining the Commission in resisting these contentions are intervenors who dispute that the Department has standing to challenge the Maritime order.[2] We conclude the Department does have standing, but also conclude that the Commission had statutory authority to pass upon the rate agreement. Because the Commission failed to secure sufficient information on which to base an informed judgment, however, we remand the order for further consideration by the Commission.
 
 I. BACKGROUND
 
 21
 Under section 15 of the Shipping Act of 1916, 46 U.S.C. Sec. 814, a broad variety of anticompetitive agreements between persons who are subject to the Act must be filed with Maritime.[3] Section 15 directs the Commission to approve such an agreement, "after notice and hearing," if the Commission concludes the agreement is neither "unjustly discriminatory or unfair" as between specified classes, "detriment[al] [to] the commerce of the United States," in violation of some other provision of the Act, nor "contrary to the public interest." The agreement is unlawful if implemented prior to approval, but, once approved, it is "excepted from the provisions of [the antitrust laws]." 46 U.S.C. Sec. 814; FMC v. Pacific Maritime Association, 435 U.S. 40, 45, 98 S.Ct. 927, 931, 55 L.Ed.2d 96 (1978); Volkswagenwerk v. FMC, 390 U.S. 261, 271, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). The Shipping Act further provides that no part of it shall be construed "to confer upon the [Commission] concurrent power or jurisdiction over any matter within the power or jurisdiction of [the] Interstate Commerce Commission [ICC]...." Shipping Act Sec. 33, 46 U.S.C. Sec. 832.
 
 
 22
 This proceeding arose out of Commission Agreement No. 10140, which was filed with the Commission and received its approval on May 1, 1975.[4] The Agreement was entered into by six of the thirteen ocean carriers that regularly transport goods from the United States Gulf Coast to the United Kingdom.[5] Under the Agreement carriers may "confer" and "agree" upon "any subject of common interest," including "rates, charges, ... and related tariff matters."[6] Four of the six carriers are members of the Gulf/U.K. Conference[7] and operate exclusively on all-water routes. Each of the other two carriers--Seatrain International, S.A. (Seatrain) and United States Lines (USL)--provides a competing service that carries containers of goods overland by rail or motor vehicle from Gulf Coast ports to Atlantic Coast ports and thence by ocean vessel to United Kingdom ports.[8] This rail or motor vehicle and water carriage is known as "intermodal" service.[9] For each of their respective intermodal minibridge routes Seatrain and USL each publish one overall rate, known as a "joint through rate," which is published by the ocean carrier and concurred in by connecting inland carriers, with each participating carrier retaining a "division" of the overall rate.[10]
 
 
 23
 The basic object of Agreement 10140 is to reduce or eliminate rate competition for Gulf/U.K. traffic between intermodal carriers Seatrain and USL, on the one hand, and the four members of the all-water Gulf/U.K. conference, on the other. The Agreement concomitantly reduces rate competition between Seatrain and USL. Each intermodal carrier, however, retains the right to deviate from any agreed-upon rate by giving 48 hours' notice.[11]
 
 
 24
 Thus, to give an example of how the Agreement works, consider the carriage of raw cotton from Houston, Texas to Northern Europe. The conference carriers transport the cotton by water from Houston to Northern Europe. However, each of the intermodal ocean carriers secures the services of an inland carrier to transport containers of the shipper's cotton by rail or motor vehicle from Houston to some Atlantic Coast port, say Charleston, South Carolina, where the goods are placed on a container ship and carried to Europe. The all-water carriers' price is set under their own conference agreement, see note 7 supra, and the intermodal carriers may agree to charge the same price under Agreement 10140. The intermodal carrier may deal directly with the shipper, treating the inland carrier's "division" as an expense.
 
 
 25
 The instant proceeding began in January 1978, when the parties to the Agreement petitioned the Commission for approval of an amendment that would extend the Agreement from April 1, 1978 for an indefinite period or until a date fixed by the Commission. Three prior requests for extension had been approved without protest from any affected party.[12] In this instance, however, the Antitrust Division of the Justice Department filed a protest in response to the notice in the Federal Register of the petition's filing and of the opportunity for filing comments and requesting a hearing. See App. at 83.[13]
 
 
 26
 The protest of the Anti-Trust Division advanced three major contentions: first, the Commission's section 15 authority covers only agreements that pertain exclusively to ocean carriage; second, and alternatively, the Agreement warrants summary disapproval as unduly violative of the antitrust principles inhering in section 15's "public interest" standard; last, in any event, the Agreement cannot be approved with a full evidentiary hearing.[14]
 
 
 27
 The Commission rejected these contentions in an Order of Approval dated August 30, 1978.[15] As to its jurisdiction, the Commission noted that the Agreement authorizes price-fixing and that its members are common carriers by water subject to Shipping Act regulation.[16] The Commission further noted that although the Agreement sets rates for through intermodal transportation, which includes carriage by inland carriers regulated by the ICC, the Agreement does not control the rates those inland carriers are to receive: those rates are determined by negotiation between individual inland and intermodal ocean carriers, and the lawfulness of the inland rate division is to be determined by the ICC, not the Federal Maritime Commission. On this basis the Commission concluded that asserting jurisdiction over the Agreement would not impermissibly encroach upon ICC jurisdiction.[17]
 
 
 28
 The Commission then rebuffed Anti-Trust's alternative argument that the Agreement was infirm under section 15's "public interest" standard. The Commission balanced the Agreement's anticompetitive consequences against its benefits and concluded that it "is not more restrictive of competition than is reasonably necessary to accomplish [its] legitimate objectives."[18] Observing that no private party had ever objected to the Agreement over its three years of existence, and concluding that the DOJ "protest raise[d] no issues of law or fact that require further examination in an evidentiary hearing," the Commission held the Agreement met all the section 15 standards and approved it through February 29, 1980.[19] This petition for review followed.
 
 
 29
 II. JUSTICIABILITY OF THE PETITION FOR REVIEW BY THE
 
 DEPARTMENT OF JUSTICE
 
 30
 In the typical case a petition to review a Maritime Commission order is brought by a private party, usually a shipper or ocean carrier whose economic interests are affected. Here, however, the petitioner is the Department of Justice, in its role as enforcer of the antitrust laws. Before addressing the substantive issues we therefore must address the claim of intervenors[20] that we lack appellate jurisdiction under these unusual circumstances. The Department submits it may seek review under the Administrative Orders Review (Hobbs) Act, 28 U.S.C. Secs. 2341-2351, but intervenors dispute that contention. They argue the Hobbs Act does not authorize this petition for review and further contend that, notwithstanding statutory authorization, the Department's petition does not present the "case or controversy" that the Constitution makes a prerequisite to federal jurisdiction. This requires a brief review of the relevant statutory provisions.
 
 A. Scope of the Hobbs Act
 
 31
 Section 4 of the Hobbs Act provides that "[a]ny party aggrieved by ["a final order reviewable under [the Act]"] may ... file a petition to review the order in the court of appeals wherein venue lies." Id. Sec. 2344. The section also contains some of the provisions that for convenience we shall collectively refer to as the "Attorney General provisions" of the Act. These are that "[t]he action shall be against the United States," and that a copy of the petition is to be served both on the agency and on the Attorney General. Id. The remainder of the Attorney General provisions are in section 8:
 
 
 32
 The Attorney General is responsible for and has control of the interests of the Government in all court proceedings under this [Act]. The agency, and any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and as of right .... The Attorney General may not dispose of or discontinue the proceeding to review over the objection of any party or intervenor, but any intervenor may prosecute, defend, or continue the proceeding unaffected by the action or inaction of the Attorney General.
 
 
 33
 Id. Sec. 2348. There is no dispute but that the Commission's approval of Agreement 10140 was a final order reviewable under the Act, see id. Sec. 2342(3), and that the Department has complied with the requirements of timely notice, etc. The only statutory question going to justiciability is whether the Act affords the Department of Justice the status of a "party aggrieved" entitled to seek review under the Act.
 
 
 34
 On several occasions this court has passed on agency orders that were challenged in petitions for review brought by the Justice Department.[21] On none of those occasions, however, was there raised the issue now before us--whether a judicial review provision authorizes the Justice Department, acting in its law enforcement capacity, to bring such a petition.[22] The question therefore appears to be one of first impression.
 
 
 35
 Beginning our analysis with the language of the Hobbs Act, we consider whether, but for the Department's statutory involvement in the defense of agency orders, it would qualify in this instance as a "party aggrieved." Concluding that it would, we then determine whether Congress in providing for that involvement meant to preclude the Department from challenging agency orders.
 
 
 36
 1. Is the Department of Justice a party aggrieved?
 
 
 37
 If the Department were challenging the Commission order on behalf of the United States' interests as a shipper adversely affected by the operation of Agreement 10140, its qualification as a party aggrieved under the Hobbs Act would not be in doubt.[23] But does the Act authorize the Department to seek review when the Department is seeking to vindicate, not the nation's proprietary interest, but the nation's sovereign interest in law enforcement? The Department argues that it is so authorized for the reason that it is a "party aggrieved by the [Commission's] final order," 28 U.S.C. Sec. 2344, in the ordinary meaning of those words. The Department participated and was thus a party in the instant proceeding before the Commission[24] and the Department was aggrieved by the final order inasmuch as "the agency action urged by the [Department] on behalf of the public's interest in competition was not adopted." Petitioner's Reply Brief (Pet.Rep.Br.) at 3. Intervenors ignore the "party aggrieved" language and concentrate on other aspects of the Hobbs Act. We find neither approach satisfactory.[25] Rather, we think analysis must begin with application of what still seem to be the leading cases on standing to seek judicial review of agency action: Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).
 
 
 38
 Under Data Processing and Barlow, a person may invoke judicial review under a statute as one "aggrieved by agency action within the meaning of a relevant statute" if he alleges (1) "injury in fact, economic or otherwise," and (2) an "interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 152-54, 90 S.Ct. at 829-30; id. at 164-65, 90 S.Ct. at 836-37. We conclude the Department can meet those requirements here: it can claim injury in fact in the sense that Commission approval of Agreement 10140 directly interferes with the Department's responsibility to enforce the antitrust laws; and it can claim to assert interests protected by the Shipping Act in the sense that the Department, as public enforcer of the antitrust laws, represents the consumer and shipping interests which are protected by the statutory constraints placed on the Commission's ability to shield anticompetitive schemes from antitrust attack.
 
 
 39
 a. Injury in fact
 
 
 40
 An injury in fact need not be economic; it may be an injury to one's interest in health, safety, recreation, or aesthetics. See, e.g., Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1975). But the injury alleged must be one that "fairly can be traced to the challenged action of the [respondent]," Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), and thus "likely to be redressed by the relief requested," id. at 43, 96 S.Ct. at 1926; accord, Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). The purpose of the injury in fact requirement is to "give[ ] specificity and concreteness to the controversy and [to] assure [ ] its presentation with adversarial vigor." Washington Utilities & Transportation Commission v. FCC, 513 F.2d 1142, 1149 (9th Cir.), cert. denied, 412 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). Although Data Processing, Barlow and other leading Supreme Court cases on standing involved individuals and private organizations, nothing in their analysis precludes its application to public agencies. The purpose of the injury in fact requirement is achieved when agency action interferes directly and specifically with the governmental responsibilities of the public agency. Washington Utilities, supra, 513 F.2d at 1149-51.[26] As the Supreme Court noted long ago in Coleman v. Miller, 307 U.S. 433, 441-42, 59 S.Ct. 972, 976-77, 83 L.Ed. 1385 (1939): "there has been recognition of the legitimate interest of public officials and administrative commissions, federal and state, to resist the endeavor to prevent enforcement of statutes in relation to which they have official duties." We therefore consider in what manner, if any, Commission approval of Agreement 10140 interferes with the Department's statutory responsibilities.
 
 
 41
 The Department is charged with the responsibility for enforcing the antitrust laws,[27] which, but for Commission approval, would proscribe agreements such as Agreement 10140.[28] In contending that Agreement 10140 is beyond Commission jurisdiction insofar as it affects land carriage, and that the Agreement should have been disapproved in any event, the Department submits that shippers who deal with the intermodal ocean carriers subject to Agreement 10140 are being deprived of the competition the antitrust laws are designed to effect: such shippers cannot bargain for the best inland carrier rate from a Gulf Coast port to an Atlantic port, but must accept a price that includes the price of inland transport. Unhindered by the obstacle of Shipping Act immunity, the Department would attack the Agreement and prevent the ocean carriers from collectively establishing a single overall rate for intermodal traffic. This action, the Department believes, would increase competition among inland carriers for Gulf/U.K. traffic and thus promote a goal of the antitrust laws the Department is charged to enforce. Under these circumstances, we conclude there is a sufficiently direct line of causation between the allegedly invalid Commission order and an interference with the Department's discharge of its statutory duties, cf., e.g., United States v. S.C.R.A.P., 412 U.S. 669, 688-89 & n. 14, 93 S.Ct. at 2405, 2416 & n. 14, 37 L.Ed.2d 254 (1973), and that such interference is "likely to be redressed by a favorable decision." Simon v. Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1970).
 
 
 42
 b. Zone of interests
 
 
 43
 A party alleging injury in fact and requesting relief that would redress it must also show that the interest asserted is arguably within the zone of interests protected by the relevant statute. Association of Data Processing Service Organizations v. Camp, supra, 397 U.S. at 152-53, 90 S.Ct. at 829-30.[29] The relevant statute in this case is the Shipping Act, which not only confers but also limits the power of the Commission to legalize anticompetitive agreements between persons subject to the Act, who are defined in Shipping Act Sec. 1, 46 U.S.C. Sec. 801. Section 33, 46 U.S.C. Sec. 832, provides the Act shall not be construed to affect the power of the ICC, and section 15, 46 U.S.C. Sec. 814, forbids the Commission to approve agreements without properly considering principles of antitrust that inhere in the section's "public interest" standard, see FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 243, 88 S.Ct. 1005, 1008, 19 L.Ed.2d 1071 (1968). These provisions protect shippers both from the approval by the Commission of agreements beyond its jurisdiction and from its improper approval of agreements within its jurisdiction.
 
 
 44
 The Justice Department is entitled, once injured by interference with its own interest in fulfilling its mandate to promote the policies of the antitrust laws, to assert the shipping public's interest in the proper administration of the Shipping Act. "[T]he fact of ... injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate." Sierra Club v. Morton, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972). Absent clear indication of a contrary congressional intent, we will not hold that the Attorney General, whose title is used to describe the broad standing rights of injured private litigants invoking the public interest,[30] cannot rely on that doctrine himself.
 
 
 45
 2. Did Congress intend to bar Justice Department review?
 
 
 46
 Having concluded that the Department as required by the Hobbs Act otherwise has the essential attributes of a party aggrieved, we now consider intervenors' contention that the "Attorney General provisions" in sections 4 and 8 of the Act mean that Congress intended to preclude the Department from assuming the role of a petitioner for review. These provisions (quoted at p. 799 supra) provide (1) that the United States is a party respondent, (2) that notice of a petition for review shall be served upon the Attorney General, and (3) that the Attorney General has responsibility for and control of the Government's interests in any court proceedings under the Act.
 
 
 47
 Examining the language and structure of the Act, we note that it neither requires the Attorney General to defend agency orders nor precludes an independent agency defense. Section 8 provides that the agency may "appear as a party ... of its own motion and of right," and that the Attorney General may not "dispose of the proceeding for review over the objection of any party." 28 U.S.C. Sec. 2348. We interpret this language to contemplate that the Department may choose to (1) defend the order, solely or in conjunction with the agency,[31] (2) remain completely passive, or (3) confess error, and attack the order, even though a statutory co-respondent.[32] In no instance is the agency left defenseless; the agency can always defend itself, as the Commission has done here. Thus, whatever theoretical difficulty may attend a petition brought by the Justice Department against the United States as a statutory respondent, we note no practical problem with an interpretation that the Hobbs Act in some circumstances entitles the Justice Department to seek review.
 
 
 48
 It is in fact the intervenors' view of the Hobbs Act that presents practical difficulty. If intervenors are correct, only parties with proprietary interests can seek review of a Maritime Commission order: the Attorney General could not challenge a Commission approval order that exceeded its statutory authority absent the fortuity that a proprietary party, with sufficient resources and a sufficient individual stake in the controversy, filed a petition for review.[33] We find no evidence of such an intent in the language or structure of the Act and will not impute to Congress the intent to achieve such result.
 
 
 49
 Intervenors, however, would take us beyond the Act's language to the legislative history of the Hobbs Act, which, they argue, "makes clear that Congress was unswerving in its conviction that on petitions for review the role of the Department on behalf of the United States, was to defend the actions of the agencies." Brief of Intervenors Sea-Land Service, Inc. and Gulf/U.K. Conference at 4. Our reading of the legislative history compels the contrary conclusion: Congress was aware that the Justice Department on occasion had been and would be an adversary of the agency--both as a co-respondent and as a petitioner--and yet evinced no intent to preclude the Department from assuming that role.
 
 
 50
 The Hobbs Act is the third in a line of statutes to provide for judicial review of certain agency orders.[34] Its first progenitor, the Commerce Court (Mann-Elkins) Act of 1910, 36 Stat. 539, codified the right to seek judicial review of ICC orders. The Act placed the petition for review within the exclusive jurisdiction of a single tribunal, the Commerce Court, from whose judgment the aggrieved party could appeal directly to the Supreme Court. Id. Secs. 1, 2, 36 Stat. 540, 542. The Commerce Court was abolished in 1913 under the Urgent Deficiencies Act, 38 Stat. 219, which transferred the Commerce Court's subject matter jurisdiction to three-judge district courts from which the aggrieved party could, as before, appeal directly to the Supreme Court. Id. at 220. The Hobbs Act, 64 Stat. 1129 (1950), made two basic changes in this scheme: it placed the petition for review within the exclusive jurisdiction of the courts of appeals; and it reduced the Supreme Court's appellate caseload by replacing appeals as of right in some instances with review upon writ of certiorari.[35]
 
 
 51
 Important as these provisions are to an understanding of the background of the Hobbs Act, our focus here is on another set of provisions, whose substance has remained essentially the same since 1910. Those provisions concern the role of the Justice Department in the defense of agency orders. Prior to the Commerce Act, the ICC defended its own orders solely with its own counsel.[36] The Act modified this practice by providing that petitions for relief from ICC orders would be brought against the United States instead of the ICC, Commerce Act Secs. 3, 4, 36 Stat. 542, 543, and that a copy of the petition would be served upon not only the ICC but also the Department of Justice, id. Sec. 1, 36 Stat. 542. In connection with this change it was also provided that "the Attorney General shall have charge and control of the interests of the Government in all cases and proceedings in the commerce court, and in the Supreme Court ... upon appeal from the commerce court...." Id. Sec. 5, 36 Stat. 543. The Urgent Deficiencies Act, although abolishing the Commerce Court, continued these provisions relating to the Attorney General in effect by providing that the "procedures in the district courts ... shall be the same as that heretofore prevailing in the commerce court." 38 Stat. 220. The Attorney General provisions then reappeared in substantially their original form in sections 4 and 8 of the Hobbs Act, 64 Stat. 1129 (1950) (quoted at p. 10 supra), which were intended to "retain the present law." H.R.Rep. No. 1619, 80th Cong., 2d Sess. 2 (1948).
 
 
 52
 In light of this historical development, intervenors contend that the rationales offered for the Attorney General provisions in 1910 are relevant to an interpretation of the corresponding provisions in the Hobbs Act, and that these rationales demonstrate Congress did not intend to permit the Department to attack an agency order in exercise of its law enforcement role. Those rationales were (1) an agency defending its own orders appears to create a conflict of interest between its role as an adjudicatory body and its role as a prosecutorial body, see S.Rep. No. 355, 61st Cong., 2d Sess. 6 (1910); and (2) the defense of ICC orders is a matter affecting "the whole country, and the conduct of such matters should be vested where the conduct of all the legal affairs of Government is vested, namely, in the Department of Justice." Id. Accord, 45 Cong.Rec. 4574 (1910) (remarks of Congressman Mann).[37]
 
 
 53
 According to intervenors, these rationales demonstrate that the Attorney General provisions of the Hobbs Act were meant merely to substitute the Justice Department for the ICC, and gave the Department no more rights than the agency into whose shoes it was placed. We have concluded, however, that the Department under the instant circumstances has the attributes of a "party aggrieved" under the Act.[38] In light of that conclusion, the question here is not whether Congress specifically intended to entitle the Department to seek review; as a party aggrieved the Department is presumptively so entitled. The question instead is whether Congress by enacting the Attorney General provisions intended to preclude the Department from seeking review. We have concluded that neither the language nor the structure of the statute supports an interpretation that challenging an agency order as a petitioner is irreconcilable with the Justice Department's role under the Hobbs Act and we find no persuasive evidence for a contrary interpretation in the legislative history.
 
 
 54
 Much of intervenors' purported support for their theory of the Hobbs Act consists of congressional colloquies between sponsors of the Commerce Court legislation and critics who wished to maintain the ICC's traditional right to defend its own orders. The former sought to assure the latter that placing the defense of agency orders under the control of the Justice Department would not compromise the integrity of such orders. One such colloquy ran as follows:
 
 
 55
 Mr. BRISTOW. Suppose that the commission should make an order and the railroad should attack it, do I understand that the Attorney-General would have the discretion as to whether or not he should defend that order? Suppose he believed that the order of the Commission was not justified?
 
 
 56
 Mr. ROOT. Mr. President. I will answer that without any hesitation or doubt. The Attorney-General would be bound upon all and the highest considerations of his professional honor and his official duty to defend the order of the Interstate Commerce Commission in all courts having jurisdiction to review it.
 
 
 57
 Mr. BRISTOW. Then, he would not have any supervisory authority as to whether or not it should be defended?
 
 
 58
 Mr. ROOT. Certainly not. It is his business to defend. He is no judge; he is no legislator; he is no reviewing authority.
 
 
 59
 45 Cong.Rec. 4104 (1910) (remarks of Senators Bristow and Root). Intervenors' reliance on this and similar exchanges is not persuasive inasmuch as the proposed statutory language to which those colloquies refer then read:
 
 
 60
 the Attorney-General shall have charge and control of the interests of the Government in all cases and proceedings in the court of commerce and in the Supreme Court of the United States upon appeal from the court of commerce. The Interstate Commerce Commission and its attorneys shall take no part in the conduct of any such litigation.
 
 
 61
 45 Cong.Rec. 7275 (1910) (emphasis added). Had this language been enacted, intervenors' point that the Justice Department cannot be "on both sides of the same case" would be well taken, for this language makes the Department the sole defender of an agency's order. But such is not the language of the statute. The bill was amended before passage to provide that the ICC shall receive notice of any commerce court action and may appear as a party of its own motion and as of right. See id. at 7276; Commerce Court Act Sec. 5, 36 Stat. 543. As amended and enacted, the bill--and the corresponding language in the present Hobbs Act--is consistent with an interpretation that permits the Justice Department and an agency to take inconsistent and even hostile positions on review of an agency order, for the agency has the right to take independent action in its own interest.
 
 
 62
 Intervenors also rely on the testimony of Judge Orie L. Phillips in the congressional hearings on bills incorporating the language that eventually became the Hobbs Act. Judge Phillips represented the members of the Judicial Conference who prepared the Act's original draft. He testified that its chief controversy concerned whether the law should be changed to make the agency the party respondent (with the Department intervening as of right) or whether the law should retain the practice of making the United States the party respondent (with the agency intervening as of right). The testimony from which intervenors cull extracts is as follows:[39]
 
 
 63
 MR. WALTER [doubting whether the Attorney General should have the power to control the agency's defense].
 
 
 64
 ....
 
 
 65
 ... Have you thought of the possibility that the Maritime Commission, for example, would insist on an appeal where the Attorney General might be fearful that, if the case is decided in accordance with what he believes the law will be, it might very seriously affect another case involving the Communications Commission that the Attorney General is about to take to the Supreme Court [?].
 
 
 66
 JUDGE PHILLIPS. Mr. Walter, these cases under these acts are not cases brought by the United States. They are petitions to review.
 
 
 67
 MR. WALTER. I understand.
 
 
 68
 MR. PHILLIPS. An order which has adversely affected a private litigant. The private litigant files the petition for review. Then the question comes in, shall we defend the agency's order. [In the vast majority of cases, in substantially all the cases, I would say, the Department of Justice and counsel for the agency will be together. There are rare instances, and that is the history of the litigation, where the agency took one view, the Attorney General took another view. It ultimately had to be determined by the Supreme Court. In a number of those instances, four or five, the views of the agency were sustained, and the views of the Attorney General did not prevail. I think the agency should have that protection.]
 
 
 69
 The Attorney General has not asked for anything further than to preserve the existing law in his amendment. I understand that satisfied him, and I think it should.
 
 
 70
 Providing for the Review of Orders of Certain Agencies: Hearings on H.R. 2915, 2916 Before Subcomm. No. 2 of the House Comm. on the Judiciary, 81st Cong., 1st Sess. 118 (1949) (emphasis added).[40]
 
 
 71
 Intervenors would have us construe this passage to mean that, as far as the Judicial Conference was concerned, the Department's role was solely to defend agency orders and there was no intent to permit the Attorney General himself to petition for review of an agency order. Viewed in context, the testimony indicates otherwise. The question put to Judge Phillips concerned the situation where there was disagreement between the Department and the agency as to whether to seek certiorari from the Supreme Court. The question thus assumed the Department and the agency were already on the same side of the case. Judge Phillips' comment that "these cases ... are not cases brought by the United States" naturally follows. Judge Phillips was not saying that the Department and the agency would never be antagonists on appeal from an agency order. Indeed, as indicated by the testimony we have placed in brackets above, Judge Phillips expressly contemplated that the Department and an agency, although nominal co-respondents, may take differing viewpoints, and each may present its own viewpoint to the court.
 
 
 72
 Judge Phillips made his understanding of the Department's role under the Hobbs Act even more clear in other testimony that intervenors also ignore. Judge Phillips spoke of the situation in which the Department thought the agency's position was wrong:
 
 
 73
 JUDGE PHILLIPS .... I do not think that it is incumbent upon the Attorney General to remain silent. He may say to the court of appeals--he may say to the Supreme Court--I think the law is this way; I think the position taken by the Commission is wrong.
 
 
 74
 But, likewise, the Commission through its counsel may say we think the Attorney General is wrong; we think the law is this way; we think the case should be decided this way for these reasons.
 
 
 75
 MR. WALTER. Do you think it is wise to find ourselves in a position where two agencies of the Government are taking an opposite position in the court of last resort?
 
 
 76
 JUDGE PHILLIPS. I do. And I think history demonstrates it is wise. In a number of instances the Department of Justice and the Interstate Commerce Commission have differed as to their views, and the views of the Interstate Commerce Commission have prevailed in the Supreme Court of the United States.
 
 
 77
 MR. KEATING. Is it not a fact that the interest of the Commission in sustaining its own order, and the interests of the Attorney General in representing, as he sees it, the United States of America, are sometimes in conflict?
 
 
 78
 JUDGE PHILLIPS. Yes.
 
 
 79
 MR. KEATING. In other words, it is essential--is it not--that the two points of view be presented?
 
 
 80
 JUDGE PHILLIPS. I think it is, and there are instances where the United States with one hand is supporting the order of the Commission, and in behalf of another agency of the Government is contesting the action of the Commission. I think that unavoidably will arise from time to time, not often but it will.
 
 
 81
 MR. KEATING. That would arise in almost any instance where the Interstate Commerce Commission decided their case against the Government.
 
 
 82
 JUDGE PHILLIPS. Well, for example, we had a case here in the District last year or so where that very situation arose with respect to some charges that were made during the war.
 
 
 83
 Id. at 115 (emphasis added).
 
 
 84
 The "number of instances" in which the Department and the ICC "differed as to their views" was detailed in a report on one of the bills incorporating the language that became the Hobbs Act, H.R.Rep. No. 1619, 80th Cong., 2d Sess. 9-12 (1948) (Additional Views).[41] An example of the seven cases cited in the report is McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), an appeal from a three-judge court which upheld an ICC order that authorized the consolidation of seven large motor carriers. There, as here, the Antitrust Division of the Justice Department presented arguments to the agency which the agency rejected. Then:
 
 
 85
 A suit was brought by a protesting motor carrier to enjoin the order, and the United States was named as defendant. The United States answered, and confessed error in the Commission's decision, and prayed for a decree setting aside the Commission's order. The same counsel who had appeared before the Commission for the Antitrust Division of the Department of Justice appeared in the Supreme Court on behalf of the [intervening] Secretary of Agriculture in an attempt to invalidate and enjoin the Commission's order.
 
 
 86
 H.R.Rep. No. 1619, supra, at 10.
 
 
 87
 Nor did McLean represent the clearest case of Department-agency conflict prior to enactment of the Hobbs Act. In the testimony we have quoted Judge Phillips also referred to a case in which the ICC and the United States were adversaries in respect to "some charges that were made during the war." Report 1619 described the case more fully:
 
 
 88
 This was a complaint to the Commission by the United States, filed to secure an award of money damages on account of numerous shipments made by the War Department. The issue was whether the refusal by the defendant railroad companies for an allowance to the United States as a shipper for wharfage [cost, etc.] ... was unjust and unreasonable.... [The Commission held for the railroads.] The United States then sued itself and the Commission, to enjoin the Commission's order.... [T]he Commission, as defendant in the case answered the petition of the United States. Shortly thereafter, the United States, as the other defendant in the case, by the Department of Justice, filed an answer to its own petition.... The answer alleges in substance that, as provided by the law, the United States "is a defendant" in the proceeding, that the Commission is a defendant, and is authorized by law to appear by its own attorneys and to defend its order without regard to the position which the United States, as a statutory defendant, may take in the case [.]" ... The Department evidently looks to the Commission to develop what is to be said for the order attacked.
 
 
 89
 Id. at 11-12.
 
 
 90
 This case came to final fruition in United States v. ICC, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), decided the year before the Hobbs Act was passed. In their argument before the Supreme Court the Commission and the intervening railroads took the position that the Urgent Deficiencies Act, under which the petition for review was brought, neither contemplated nor permitted the bringing of such petitions by the United States, because the Act made the United States an indispensable defendant. See 93 L.Ed. at 1454, 1455. The Court unanimously rejected that proposition,[42] finding no congressional purpose to amend the Attorney General's "statutory duty ... to seek judicial redress for the Government":
 
 
 91
 Although the formal appearance of the Attorney General for the Government as statutory defendant does create a surface anomaly, his representation of the Government as a shipper does not in any way prevent a full defense of the Commission's order.... For, whether the Attorney General defends or not, the Commission and the railroads are authorized to interpose all defenses to the Government's charges ....
 
 
 92
 337 U.S. at 431, 432, 69 S.Ct. at 1413, 1414.
 
 
 93
 In light of the cases featuring Department-agency conflicts and of the committee hearing and committee report references to such cases, we presume Congress was aware of interpretations that recognized the Department's independent role--both as a co-respondent and as a petitioner--under the scheme of review created by the Urgent Deficiencies Act. We further conclude that Congress adopted those interpretations by carrying forward relevant prior law into the Hobbs Act.[43]
 
 
 94
 Intervenors would distinguish ICC on the basis that Justice Department standing there was mandated by the need to give the United States access to the courts on a basis equal to that of private shippers. Although that need was undoubtedly a consideration, the Court's rationale was broader: Congress did not intend, by making the United States a statutory respondent, to modify the Justice Department's prior "statutory duty" to vindicate government interests. The Court did not distinguish, as intervenors would wish, between proprietary interests and other governmental interests which are equally the duty of the Justice Department to pursue.
 
 B. Case or Controversy
 
 95
 Intervenors' final contention with respect to the Department's ability to sue is that, notwithstanding the Department's statutory authorization to petition for review, the case or controversy that art. III, Sec. 2 of the Constitution makes a prerequisite to federal jurisdiction is absent here because "the United States is suing itself." Brief of Intervenors Sea-Land and Gulf/United Kingdom Conference at 23. We believe, however, that the structure of the government of the United States permits cases and controversies to arise between separate agencies. This is another issue the Supreme Court addressed in United States v. ICC. In ICC the Court, noting that the United States was both the party bringing the action and a named defendant thereto, acknowledged that
 
 
 96
 a suit filed by John Smith against John Smith might present no case or controversy which courts can determine. But one person named John Smith might have a justiciable controversy with another John Smith.
 
 
 97
 337 U.S. at 430, 69 S.Ct. at 1413. The Court looked behind the names of the nominal parties to determine the real parties in interest, and discovered there was a justiciable controversy over "who is legally entitled to sums of money, the Government or the railroads." Id.
 
 
 98
 Intervenors would distinguish ICC on the ground that the actual dispute in ICC was between the United States as shipper and certain railroads, whereas the actual dispute here is between the United States as sovereign and an agency of the United States. See United States v. Easement and Right of Way Over Certain Land in Bedford County, Tennessee, 204 F.Supp. 837 (E.D.Tenn.1962) (no justiciable controversy between Tennessee Valley Authority, a governmental agency bringing land condemnation suit, and Farmers Home Administration, a governmental agency holding security interest in the subject land). The Department responds that United States v. ICC is on point because the actual dispute is between itself and the ocean carriers whose agreement, absent valid Commission approval, violates the antitrust laws. The Department contends in the alternative that there is sufficient adversity between it and the Commission, an independent agency with an interest in upholding its own orders.
 
 
 99
 Assuming arguendo that the real parties in interest are the Department and the Commission, as intervenors contend, we hold that United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) disposes of this issue in favor of the Department. The Nixon Court held justiciable a controversy between (1) a Special Prosecutor, who was empowered by regulation to contest the invocation of executive privilege and who sought material he deemed to be admissible in a pending criminal case, and (2) the President, who resisted a subpoena for the material on the ground of his duty to preserve confidential presidential communications. The Court ruled that although the dispute was between officials of the same branch of government, the issues presented were "of a type which are traditionally justiciable," 418 U.S. at 697, 94 S.Ct. at 3102 (quoting United States v. ICC, supra, 337 U.S. at 430, 69 S.Ct. at 1413), and were raised in a setting that assured "concrete adverseness" of the parties. Id. The Court concluded that a justiciable controversy was presented for decision. Much the same can be said of the issues presented here. The Department of Justice is the authorized and traditional advocate of antitrust policies in agency litigation, see, e.g., McLean Trucking Co. v. United States, supra, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544, which policies are implicated by the "public interest" standard of section 15 of the Shipping Act, and the Commission obviously has a role before this court as an advocate of its own perception of the public interest. See 28 U.S.C. Sec. 2348 (agency's right to appear as party). This dispute over the validity of a Commission order raises issues that courts traditionally resolve and the setting assures the concrete adverseness on which sharpened presentation of the issues is thought to depend. The parties' controversy is justiciable.
 
 
 100
 III. JURISDICTION OF THE FEDERAL MARITIME COMMISSION
 
 
 101
 The Shipping Act of 1916 permits ocean carriers to agree among themselves to moderate the competition that Congress thought was destructive. As we explained in United States Lines v. FMC, 189 U.S.App.D.C. 361, 584 F.2d 519 (1978):
 
 
 102
 the Shipping Act of 1916 represents a compromise between the established national antitrust policy and the potential public benefits to be derived from allowing ocean carriers to restrict or eliminate competition among themselves. An extensive congressional study of the practices of carrier conferences and their advantages and disadvantages was made in 1914, culminating in what has come to be known as the Alexander Report. H.R.Doc. No. 805, 63d Cong., 2d Sess. (1914). While the report found that there were substantial advantages to conference arrangements, it also identified various abuses in which conferences had engaged. Consequently, it was the recommendation of the report, adopted by Congress, that shipping conferences be allowed to continue only under government regulation.
 
 
 103
 Id. at 527.[44] To that end section 15, "the heart of the Shipping Act,"[45] makes the Commission "the public arbiter of competition in the shipping industry,"[46] generally requiring ocean carriers to file for FMC approval or disapproval any agreement that limits competition between them. 46 U.S.C. Sec. 814.[47] Any such agreement not approved is unlawful to implement. Id.
 
 
 104
 The issue at this point in the analysis is whether section 15 extends to Agreement 10140, which contemplates that intermodal ocean carriers and all-water competitors of these carriers may fix rates to be charged shippers for using their services, which in the case of intermodal carriers would include inland transportation. The law controlling that issue is best understood if we first examine the operation of Agreement 10140 against the background of related shipping practices.
 
 
 105
 Carriage of goods by sea is, and always has been, intermodal in nature. Cargo rarely originates at, or has a final destination alongside, an ocean carrier's pier. Hence, connecting carriage by rail, by motor, or, in earlier days, by horse drawn inland transport has always been necessary. Similarly, rates to cover the constituent transportation elements of this through movement have always been required. These rates appear in many forms. Although only one form--the joint through rate--is directly at issue here, two others are relevant--the local through rate and the proportional through rate. Relying on the discussion in Pennsylvania v. ICC, 182 U.S.App.D.C. 280, 561 F.2d 278, 281-83 (1977), we note the similarities and differences among those rates as follows.
 
 
 106
 A through rate is the total rate charged by a carrier or group of carriers for providing transportation from a point of origin to a point of destination. When only one carrier is involved, the rate charged the shipper is a local through rate. When transport requires a series of two or more connecting carriers, the total rate may be the sums of the carrier's local rates, the sums of their proportional rates, or a single joint rate. A proportional rate is the rate that a carrier charges for shipping goods that have a subsequent or prior movement over the line of another carrier. This charge is almost always lower than the carrier's purely local rate between the same two points on its line. The shipper relying on multi-carrier transportation, then, will often sum up proportional rates in arriving at his total rate. The shipper may also look for a joint through rate, a single rate expressing the total through carriage cost. This rate is published by one of the participating carriers, which negotiates with the other carriers the divisions of the total rate that they are to receive. These divisions closely resemble proportional rates, i.e., a joint through rate is "similar in purpose and effect" to a combination of proportional rates. Id. at 283. Because the joint rate is expressed in a single tariff, however, it simplifies routing, documentation, and billing, and often makes possible a rate lower than the corresponding combination of proportional rates.
 
 
 107
 The use of joint and proportional rates is more complicated in the intermodal context, where an inland carrier connects with an ocean carrier. Rail-ocean joint through rates were filed with the ICC until 1908, when the ICC decided it had no jurisdiction to accept such filings.[48] After passage of the Shipping Act of 1916 and thereafter until 1969, through rail/motor vehicle-ocean rates were in the form of combinations of proportional rates filed separately by inland carriers with the ICC and by ocean carriers with the Commission.[49] In 1969, the ICC reversed itself and decided to accept the filing of joint through intermodal rates, a decision we affirmed in Pennsylvania v. ICC, supra, 561 F.2d at 278.[50]
 
 
 108
 The Federal Maritime Commission asserted jurisdiction over joint through rates at about the same time,[51] and has since issued a rule expressly providing for the filing of such rates, 46 C.F.R. Sec. 538.6 (1979), which implicitly contemplates both rail/motor vehicle-ocean tariffs and section 15 agreements concerning same.[52] This assertion of jurisdiction is consistent with section 18(b)(1) of the Shipping Act, which provides that conferences or individual carriers in foreign commerce shall file tariffs "for transportation to and from United States ports and foreign ports between all points on its own route and on any through route which has been established." 46 U.S.C. Sec. 817(b)(1) (emphasis added). Joint through rate tariffs and ocean/inland bills of lading were developed in 1972, when Seatrain filed the first intermodal tariff with the Commission.[53] Since that time, the Commission has approved a number of intermodal rate-making agreements under section 15.[54]
 
 
 109
 As it now stands, insofar as the FMC is concerned, an individual carrier is free to operate a through intermodal service by filing an overall tariff that sets out separately the ocean carrier's division. And, under Section 15 and 46 C.F.R. Sec. 536.8, groups of carriers can apply for Commission approval of their intermodal rate-making, as the members of Agreement 10140 did here. See Seatrain, International, S.A. v. FMC, 189 U.S.App.D.C. 388, 584 F.2d 546, 548 (1978) (noting Commission practice of approving intermodal rate-making by conferences).[55] Although agency jurisdiction is ultimately a matter of statutory construction by the courts, FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745-46, 93 S.Ct. 1773, 1784-85, 36 L.Ed.2d 620 (1973), Commission's consistent and long-standing assertion of its statutory authority in this context is entitled to great deference, see United States v. National Association of Securities Dealers, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); Saxbe v. Bustos, 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974), and the validity of section 536.8, considered by the Commission a "regulation[ ] ... necessary to carry out the provisions of the [Shipping Act]," 46 U.S.C. Sec. 841a, should be sustained if reasonably related to the purposes of the Act. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973).
 
 
 110
 In challenging the FMC decision to take jurisdiction over Agreement 10140, the Department of Justice raises two major objections. The first, and broadest, is that section 15 simply does not reach "agreements among ocean carriers regarding rates which are themselves beyond its authority to regulate." Pet.Br. at 24. The second objection is that the Commission in approving the fixing of intermodal rates is approving the fixing of inland rates and thus violating the Shipping Act's limitation provision in favor of ICC jurisdiction. We shall examine these contentions in turn.
 
 A. Scope of Section 15
 
 111
 The Justice Department does not object to individually-filed intermodal tariffs or to the agreements between ocean and inland carriers that occur in connection with those tariffs. Pet.Br. at 12 n. 9. Nor does the Department quarrel with cases[56] upholding the FMC's section 15 authority to approve a conference's fixing of the proportional ocean rates that will apply on intermodal routes. Id. What the Department does object to is assertion of Commission jurisdiction over an agreement among competing ocean carriers "regarding the rates to be charged shippers using ... intermodal services," id., i.e., an agreement permitting the collective fixing of joint intermodal through rates. The Commission and the intervening conferences respond that combinations of ocean/inland proportional rates are identical in purpose and effect to joint through rates which state separate ocean and inland divisions. To treat the two forms of rates differently for section 15 jurisdictional purposes, they contend, elevates form over substance, Commission Brief at 24-27; Intervening Conferences Brief at 12-14, 25, and creates a substantial loophole in section 15 that unjustifiably hampers the Commission's ability to promote a workable conference system, id. at 14.
 
 
 112
 With the issue thus framed, we turn to an examination of the principal cases that bear on the scope of the Commission's jurisdiction under section 15. Most of these cases[57] involve ocean carrier agreements that are related to collective bargaining contracts. Although arising in a different context than that before us here, these maritime labor cases offer persuasive guidance on the scope of the Commission's authority over rate agreements generally.
 
 
 113
 The Supreme Court first addressed the maritime labor issue in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). At issue in Volkswagenwerk was whether an agreement among employers subject to the Shipping Act had to be filed and approved under section 15 before it could be implemented. The agreement allocated among the employers the costs of creating a fund used to mitigate the impact upon employees of technological unemployment. The fund was the price of union acquiescence in the elimination of certain restrictive work practices. A shipper aggrieved by the operation of the allocation formula contended the agreement was unlawful because it was not first filed with the Commission. The Commission, although conceding the agreement was subject to section 15's literal terms, concluded the section covered only agreements that "affect competition" in the maritime trade and that the allocation agreement did not so affect competition because there was no agreement to pass on the costs of the agreement to the members' customers. The court of appeals affirmed, but the Supreme Court reversed, criticizing this "extremely narrow view of a statute that uses expansive language." 390 U.S. at 273, 88 S.Ct. at 936. The Court noted in effect that the agreement did "affect competition" in any realistic sense of that phrase because the agreement "necessarily affected the cost structures of, and the charges levied by, individual ... members." Id.
 
 
 114
 The Court again applied section 15 to a maritime labor agreement in FMC v. Pacific Maritime Association, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978). The agreement in this case was a collective bargaining agreement authorizing the members of a multiemployer bargaining unit--employers who were subject to the Shipping Act--to impose certain labor practices and costs on nonmember employers with whom the members dealt. Although the Commission held the agreement subject to filing because it aimed to "control or affect competition between members and nonmembers" by eliminating the members' competitive disadvantage in terms of labor cost, and thus had "a potentially severe and adverse effect upon competition," see 435 U.S. at 52, 98 S.Ct. at 934, the court of appeals held the agreement beyond the Commission's section 15 jurisdiction on the ground that national labor policy would be frustrated by requiring preimplementation filing of a collective bargaining agreement.
 
 
 115
 The Supreme Court reversed, holding that neither labor policy nor antitrust policy warranted a departure from "the plain terms of the Sec. 15." Id. at 56, 98 S.Ct. at 936. Rejecting the argument that anticompetitive collective bargaining agreements should be left to the courts and the antitrust laws, the Court statedCongress has made the Commission the arbiter of competition in the shipping industry; and if there are labor agreements so anticompetitive that they are vulnerable under the antitrust laws, it is difficult to explain why the Commission should not deal with them in the first instance and either approve or disapprove them under the standards specified in Sec. 15.
 
 
 116
 Id. at 63, 98 S.Ct. at 940.
 
 
 117
 The Commission relied on the maritime labor analogy in finding certain absorption and bargaining practices subject to section 15 in Investigation of Overland and OCP Rates and Absorptions, 12 F.M.C. 184 (1969), aff'd sub nom. Port of New York Authority v. FMC, 429 F.2d 663 (5th Cir.1971), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). The respondents in Overland & OCP Rates were Pacific Coast ocean carrier conferences who were competing with Atlantic and Gulf carriers for Midwest traffic by, inter alia, offering special ocean rates (proportional rates) for cargo destined for or originating in the Midwest. Atlantic and Gulf port interests protested to the Commission that certain Pacific conference practices were unauthorized by the Commission and were thus unlawful. Necessary to this argument, of course, was a preliminary finding that the practices were subject to section 15.
 
 
 118
 The Commission made this finding with respect to two of the challenged practices.[58] The first involved agreements between each conference and the transcontinental railroads, which allocated between them the absorption of the shipper's Pacific port terminal costs on traffic to and from the Midwest. Id. at 215. The second practice involved
 
 
 119
 transactions among representatives of the respondent conferences and of the transcontinental railroads which might conceivably be considered understandings concerning the setting of rail or overland ocean rates; and since the two [rates] are interdependent in setting [the overall rate], any understanding concerning one might affect the other. There were no binding agreements ... yet the purpose was quite clearly to bring about action necessary to achieve an effective aggregate of rail and ocean rates.
 
 
 120
 Id. at 216. The Commission found both the absorption practice and the negotiation concerning the ocean and rail portions of the overall rate to be subject to section 15, reasoning as follows:
 
 
 121
 Since the agreement affects ocean rates, they [sic] may be subject to section 15. The agreement is somewhat analogous to a multiemployer agreement with a labor union concerning wages. "The signatories to a collective bargaining agreement are frequently, by the very act of signing, agreeing with their own competitors on matters such as labor costs, certain nonlabor costs, service to be provided to the public, and (indirectly) price increases." Volkswagenwerk v. FMC, 390 U.S. 261, 284, 88 S.Ct. 929, 941, 19 L.Ed.2d 1090 (1968) (concurring opinion of Mr. Justice Harlan). So the respondent conferences, in collectively agreeing with the railroads on the allocation of terminal costs absorptions, or reaching an understanding as to the proportion of a through overland charge which it is desirable to have covered by the rail or ocean rate,[7] are, by the act of entering into such agreement or understanding, agreeing with each other as conference members on matters more or less directly related to their own rates and charges.[8]
 
 
 122
 Id. at 216 (emphasis added). The Commission went on to rule that the absorption agreement and "any joint action of record among conferences and railroads toward the establishment of rail or ocean rates which would produce a competitive ocean-rail combination" were incidental to the ratemaking the Commission had previously approved. The Fifth Circuit affirmed on this point. 429 F.2d at 667-68.
 
 
 123
 We think that the maritime labor cases and the Commission's decision in Overland & OCP Rates control the question of section 15's application here. The gravamen of the Department's complaint is that "FMC jurisdiction to approve agreements among water carriers regarding through intermodal rates in their totality gives those carriers substantial concerted control over the inland as well as the water portions of those rates." Pet.Rep.Br. at 14-15. Assuming, without deciding, that such is the case, we find Agreement 10140 analogous to a multi-ocean carrier labor agreement, with the divisions of inland carriers representing an expense to the intermodal carriers analogous to labor costs. Section 15 applicability to Agreement 10140 also follows from Overland & OCP Rates, for there ocean carriers collectively bargained with railroads as to matters affecting rates, including the inland portion of the overall rate, whereas the corresponding bargaining here is only between individual carriers. The Department would distinguish Overland & OCP Rates by emphasizing that the ocean carrier-railroad contracts were "actually mere exchanges of information, not agreements. See 12 F.M.C. at 216 n. 7." Pet.Rep.Br. at 20 n. 16. Yet this distinction cuts only in favor of Commission jurisdiction. If the FMC can take section 15 jurisdiction over "mere exchanges of information" (so long as they "affect[ ] ocean rates," as the Commission found), section 15 jurisdiction over agreements follows a fortiori. If the purpose of the agreement is to affect competition among persons subject to the Act in connection with ocean transportation, then it is subject to section 15's filing requirement and thus to the Commission's approval or disapproval. See FMC v. Pacific Maritime Association, supra, 435 U.S. at 53, 53-63, 98 S.Ct. at 935, 935-940 (1978) ("any contract between carriers 'controlling, regulating, preventing, or destroying competition' ... is within the reach of Sec. 15"); Volkswagenwerk v. FMC, supra, 390 U.S. at 273-77, 88 S.Ct. at 936-38; New York Shipping Association v. FMC, 495 F.2d 1215, 1221 (2d Cir.), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974) (section 15 triggered by "agreement [that] would necessarily affect persons subject to the Shipping Act and ultimately would alter relations among shippers of various types of cargo").[59]
 
 
 124
 We are also persuaded that an adoption of the Department's position would eviscerate a basic policy of the Shipping Act--to promote the effectiveness of the ocean carrier conference system. All here agree that individual ocean carriers may post and charge joint intermodal through rates. The only question is whether carriers should be permitted to set such rates collectively. The only way this rate-setting can occur, without inviting the antitrust liability that fastens upon price fixing, is by getting Commission approval of a ratemaking agreement under section 15. If the Department is correct, however, such an agreement is beyond the Commission's power even to consider, much less approve. We find the Department's desired result anomalous: it would create a large loophole in section 15 that would destroy the effectiveness of conference ratemaking by permitting conference members routinely to shed their conference obligations as to any particular cargo movement simply by filing an individual rate in a joint rate form. That such a development might be desirable solely from an antitrust viewpoint we do not doubt. But antitrust considerations are essentially irrelevant to any outline of section 15's jurisdictional scope. They are considered in the decision whether to approve, a step that occurs only after jurisdiction is assumed. See FMC v. Pacific Maritime Association, supra, 435 U.S. at 63, 98 S.Ct. at 940.
 
 B. Effect of the ICC Limitation Provision
 
 125
 It is not enough, however, to conclude that Agreement 10140 falls within the literal language and implicates the central policies of section 15; we must also be satisfied that our interpretation of section 15 does not violate Section 33 of the Shipping Act, which provides:
 
 
 126
 This [Act] shall not be construed to affect the power or jurisdiction of the [ICC], nor to confer upon the [FMC] concurrent power or jurisdiction over any matter within the power or jurisdiction of such [ICC].
 
 
 127
 46 U.S.C. Sec. 832. The question, therefore, is whether FMC authority to approve ocean carrier agreements that contemplate the fixing of joint through intermodal rates will interfere with the exercise of ICC jurisdiction in violation of section 33.[60]
 
 
 128
 The Department's argument here parallels its argument that section 15 simply does not reach the approval of joint intermodal through rates, see Part III.A. supra. It is in one respect an improvement, however, for the present argument has the virtue of relying on a statutory provision--section 33--that under certain factual considerations can operate to limit the Commission's jurisdiction.[61] On the facts before us, however, we find no indication that the Commission has transgressed that limit. To explain that conclusion we must briefly review ICC and Commission regulatory practice with respect to joint through intermodal ratemaking.
 
 
 129
 Both the ICC and the Commission accept the filing of joint intermodal through rates by carriers subject to their respective jurisdictions, with the requirement that the filing carrier set forth the division of the total rate it is to receive.[62] Neither agency, however, claims the authority to disprove or suspend the rates charged by carriers subject to the jurisdiction of the other. In Pennsylvania v. ICC, supra, we specifically upheld the ICC's decision to require that the inland portion of the joint rate be set out separately and to limit its substantive regulation to the inland rate. 561 F.2d at 291. We noted that any attempt by the ICC to regulate the foreign segment of the joint rate would "plainly usurp[ ] the FMC's jurisdiction under the Shipping Act." Id.
 
 
 130
 Because the ICC specifically allows inland carriers to participate with individual ocean carriers and conferences of such carriers,[63] and because the ICC asserts substantive regulatory jurisdiction over only the inland portion of an overall intermodal through rate, we are not convinced that Commission approval of joint through rates invades ICC jurisdiction or otherwise interferes with the exercise of ICC power. The Department, however, suggests that
 
 
 131
 the power to approve agreements fixing both the overall rate and the ocean carrier division necessarily entails the power to approve fixing the inland division as well.[11] It further follows that the existence of such a power conflicts with the ICC's authority to regulate the inland carriers, and cannot be reconciled with section 33 of the Shipping Act.
 
 
 132
 Pet.Br. at 13. We would work the formula differently. The object of Agreement 10140 is to reduce the differential between intermodal and all-water rates for Gulf/U.K. traffic. Common sense would suggest, and at oral argument counsel for the Justice Department agreed, that ratemaking proceeds in this order: First, the all-water conference carriers publish a tariff under their own conference agreement, see note 7 supra, for a particular cargo movement. Then, pursuant to Agreement 10140, the intermodal carriers decide whether to adopt that rate. For each carrier that decision will depend upon its ability to obtain a favorable rate from an inland carrier. In the Department's symbols this process is best described by the equation of c (total joint rate) minus b (inland division) equals a (ocean division). Agreement 10140 does not fix inland rates.
 
 
 133
 Even if it could be said that the ocean carriers somehow do collectively determine inland rates, it remains that no inland division of a joint rate can exist without ICC approval. "Divisions of joint rates by carriers subject to ICC jurisdiction ... must be reasonable," 49 U.S.C. Sec. 10701(a), and the ICC has power to "prescribe ... the division of joint rates, and the conditions under which those routes must be operated," 49 U.S.C. Sec. 10705.
 
 
 134
 Unable to point to any specific ICC regulatory function that FMC approval of joint through intermodal rates would impede, the Department argues that such approval frustrates the ICC's ability to "protect the interests of the public." Pet.Br. at 21. The fixing of through intermodal rates, the argument runs, deprives Gulf/U.K. shippers of price competition between inland carriers, whereas if the Commission were limited to approval of proportional ocean rates, shippers could negotiate their own inland rate and get a better overall price. We agree with the Commission and intervenors that this contention exalts form over substance. The Department acknowledges that the Commission could take jurisdiction over an agreement that eliminated intermodal transit's price advantage over all-water transit if such an agreement were limited to the fixing of the intermodal carriers' proportional ocean rates. See Pet.Br. at 20, Pet.Rep.Br. at 19-20. Assuming the Department is right in saying this arrangement would permit Gulf/U.K. shippers to drive a better bargain with inland carriers, we fail to see how the shipper's lot would be improved with respect to the overall rate, for the intermodal ocean carriers can then agree to charge a correspondingly higher ocean rate to advance the goal of reducing price competition between intermodal and all-water carriers. See generally Overland & OCP Rates, supra, 12 F.M.C. at 216.
 
 
 135
 In light of the above we conclude that Agreement 10140 was an agreement subject to section 15 filing and approval or disapproval by the Commission. Moreover, nothing in section 33 would counsel a different interpretation, for there is no practical conflict between ICC and Commission jurisdiction over the filing of the joint intermodal through rates; the Commission's approval of the Agreement leaves the ICC's jurisdiction over inland carriers and inland rates unimpaired.
 
 IV. ADEQUACY OF HEARING
 
 136
 Two issues remain: whether the Commission's decision not to hold an evidentiary hearing was an abuse of discretion and, given the absence of such a hearing, whether under the applicable standard of judicial review its approval of Agreement 10140 was justified.
 
 
 137
 We consider these issues against the background of section 15's directive that the Commission "disapprove, cancel, or modify any agreement ... contrary to the public interest."[64] This language requires that the Commission consider the antitrust implications of all agreements submitted to it for approval.[65] Once it appears that an agreement entails an antitrust violation, "this alone will normally constitute substantial evidence that the agreement is 'contrary to the public interest,' unless other evidence in the record fairly detracts from the weight of this factor." FMC v. Aktiebolaget Svenksa Amerika Linien, supra, 390 U.S. at 246, 88 S.Ct. at 1010. The proponents of an anticompetitive agreement must therefore show it is "required by a serious transportation need, necessary to secure important public benefits, or in furtherance of a valid regulatory purpose of the Shipping Act," id. at 243, 88 S.Ct. at 1008, and the Commission must " 'scrutinize the agreement to make sure that the conduct ... legalized [through section 15 approval] does not invade the prohibitions of the antitrust laws any more than is necessary to serve the purposes of the regulatory statute.' " United States Lines v. FMC, supra, 189 U.S.App.D.C. at 370, 584 F.2d at 528 (quoting Volkswagenwerk v. FMC, supra, 390 U.S. at 274 n. 21, 88 S.Ct. at 936 n. 21).
 
 A. Procedural Adequacy
 
 138
 In the administrative proceeding, the proponents of Agreement No. 10140 submitted affidavits and memoranda in support of an extension of the Agreement. The Department's protest was filed in response to these submissions and in response to the Commission's notice in the Federal Register. The notice directed persons submitting comments and requests for hearing to set forth "with particularity" facts and arguments concerning approval, modification, or disapproval of the Agreement. See note 13 supra.[66]
 
 
 139
 The Department did not deny or otherwise respond to the factual showing made by the proponents of the Agreement. The Department's request for hearing proceeded not on the claim that proponents' factual assertions were in any respect inaccurate, then, but on the theory that any agreement amounting to a "serious, per se violation" of the antitrust laws requires a pre-approval evidentiary hearing, and that price-fixing, clearly an object of Agreement 10140, was of that serious nature. App., at 102-03.
 
 
 140
 The Commission acted well within its discretion in deciding "[t]he [Department's] protest raises no issues of law of fact that require further examination in an evidentiary hearing."[67] Although section 15 indicates that approval of an agreement can occur only "after notice and hearing" (see note 64 supra ), this requirement may be satisfied by "something less time-consuming than courtroom drama." Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577, 589 (1969). The formal evidentiary hearings that the Administrative Procedure Act requires in instances where the agency must have "a hearing on the record" are not required in Commission hearings inasmuch as Shipping Act Sec. 15 lacks that stipulation. United States Lines v. FMC, 189 U.S.App.D.C. 361, 378, 584 F.2d 519, 536 (1978) (citing United States v. Florida East Coast R. Co., 410 U.S. 224, 234-38, 93 S.Ct. 810, 815-17, 35 L.Ed.2d 223 (1973)). The Commission thus enjoys "flexibility in structuring Section 15 hearings in light of the circumstances of the case and the nature of the issues involved." Id. 378-79, 584 F.2d at 536-37. It need only "conduct whatever proceedings are necessary to secure sufficient information so that its final decision will reflect 'a consideration of the relevant factors.' " Seatrain International, S.A. v. FMC, 189 U.S.App.D.C. 388, 392, 584 F.2d 546, 550 (1978) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).
 
 
 141
 The Justice Department's comments, while placing the Commission on notice of some of the antitrust questions raised by the Agreement, gave no promise that the Department would make any contribution toward the case's factual development. Moreover, no shipper affected by the Agreement in its nearly three years of operation had objected to it, even though the Agreement was placed under Commission review on several prior occasions. See note 12 supra. And the Agreement was extended only temporarily, for the relatively short term of 18 months, see United States Lines v. FMC, supra, 584 F.2d at 529-30. We do not doubt that a full-blown evidentiary hearing conceivably might have sharpened the issues or otherwise have contributed to reasoned decisionmaking. But the costs of any adversary hearing loom large in contrast to these speculative benefits. In view of these circumstances, we cannot say the Commission abused its discretion in deciding to dispose summarily of the Department's legal and policy arguments.[68]
 
 B. Substantive Adequacy
 
 142
 The final question is whether, given the absence of an evidentiary hearing, the Commission was justified in concluding on the record before it that the proponents of Agreement 10140 had shown that their anticompetitive agreement was required by a serious transportation need, necessary to secure important public benefits, or in furtherance of a valid regulatory purpose of the Shipping Act. FMC v. Aktiebolaget Svenska Amerika Linien, supra, 390 U.S. at 243, 88 S.Ct. at 1008. The agency's decision to treat the Department's antitrust objections summarily requires that we "closely scrutinize" its conclusions, Gulf State Utilities Co. v. FPC, 411 U.S. 747, 763, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973), and "examine the supporting findings and assumptions with especial care," United States v. FCC, supra, 96-97. We thus examine in some detail the links in the Commission's chain of reasoning, recognizing, of course, that the agency's findings and conclusions must be affirmed unless "arbitrary, capricious, an abuse of abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. Sec. 706(2)(A), i.e., we are not to supplant the agency's judgment with our own. New York Shipping Association, Inc. v. FMC, 202 U.S.App.D.C. 253, 628 F.2d 253, 258 (1980); United States Lines v. FMC, 189 U.S.App.D.C. 361, 584 F.2d 519, 526 (1978).
 
 1. Judgmental conclusions
 
 143
 The Commission has concluded that Agreement 10140 merited an extension for another 18 months because it "is not more restrictive of competition than is reasonably necessary to accomplish proponents' legitimate objectives":[69]
 
 
 144
 "[w]ithout the stabilizing influence of [Agreement 10140,] uncontrolled rate cutting is likely to develop which would result in service disruptions and the probable elimination of some carriers from the trade--conditions which the Shipping Act was intended to eliminate."[70]
 
 
 145
 The Commission saw no anticompetitive effect of "major significance" to counteract this "stabilizing influence":[71] The Agreement's members faced competition from six independent all-water liner services and one independent minibridge service as well as from a number of unregulated "tramp operators."[72] Moreover, the Commission noted that the intermodal carriers' right to pursue independent action on 48 hours' notice (see TAN 11 supra )
 
 
 146
 permits some rate competition to exist between Proponents. Although Seatrain and USL have generally maintained rate parity with the conference carriers, they have and will
 
 
 147
 ... adjust [their] rates as [they deem] necessary to meet the demands of shippers, competition from independent lines, or competition from members of the Gulf/United Kingdom Conference.[73]
 
 
 148
 The Department contends the Commission's reasoning is arbitrary for failing to pay adequate heed to the Agreement's effect on prices and for treating the survival of ocean carriers as a legitimate objective under the Shipping Act. Pet.Br. at 35, 37-38a. Neither argument is persuasive. The Commission was aware that proponents carry about 65% of the goods moving in the traditional liner cargo market and that they quote prices 10-15% above those of the independent carriers.[74] We are not in position to quarrel with the Commission's judgment that Agreement 10140's prevention of "uncontrolled rate cutting" and its consequences would justify the higher prices that customers of Agreement members must pay. Nor can we say the Commission was wrong in considering the importance of preserving carrier capacity, which it could relate to adequate service and, in turn, to the public interest factors of a serious transportation need, an important public benefit, or a valid regulatory purpose of the Shipping Act. The Commission has rationally related its judgmental conclusions to its factual finding that absent the Agreement "uncontrolled rate cutting is likely to develop." See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). In these instances we perceive the Commission exercising an expert judgment to which we must defer.[75] But we must also be satisfied, before we affirm the Commission's order, that the factual predicate of its conclusion is also adequate. It is to that inquiry we now turn.
 
 2. Factual conclusions
 
 149
 Although Commission orders are not subject to the provision of the Administrative Procedure Act requiring that agency decisions be supported by substantial evidence on the record considered as a whole, United States Lines, supra, 189 U.S.App.D.C. at 368, 189 n.35, 584 F.2d at 526, courts have routinely assumed that Commission orders are subject to some kind of substantial evidence standard,[76] presumably on the theory that an agency decision that is not based on substantial evidence should be overturned as arbitrary and capricious or as an abuse of discretion. See Pacific Legal Foundation v. DOT, 193 U.S.App.D.C. 184, 593 F.2d 1338, 1343 n. 35, cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979).[77] Substantial evidence generally has meant "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." But this "does not go so far as to justify orders without a basis in evidence having rational probative force." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 216, 217, 83 L.Ed. 126 (1938). Another way of stating this standard is to ask whether the record contains data sufficient to support an informed conclusion. We thus examine the record support for FMC's factual conclusions.
 
 
 150
 The central premise of the Commission's ultimate finding that Agreement 10140 is not contrary to the public interest is that there is a need to alleviate "disruptive pressures" in the Gulf/U.K. trade. That such pressures exist was inferred from the practices of the Baltic Shipping Company, "a Soviet flag controlled carrier with a demonstrated policy of predatory pricing."[78] There is record evidence to support the Commission's finding that Baltic Shipping Company does indeed undercut its competitors' prices by as much as 25-30%.[79] There is a dearth of evidence, however, to support the Commission's related prediction that absent a rate agreement it would be
 
 
 151
 especially difficult for Seatrain and USL to resist lowering their rates to meet the aggressive pricing policies of Baltic Shipping Company on high value container cargo in the absence of a rate agreement. Such cargo is incremental to Seatrain and USL's intermodal service, but it is the mainstay of the conference carriers' operation. If a rate war developed between intermodal carriers and the all-water carriers, it is unlikely that the conference could survive.[80]
 
 
 152
 "These recitations are ample in rhetoric, but 'sparing in detail.' "[81] The supporting evidence consists solely of the unsubstantiated opinion of the proponents' affiant, the Secretary of Agreement 10140.[82] As we said in United States v. CAB, supra, 511 F.2d at 1326:
 
 
 153
 questions as to probable competitive behavior and its probable effects are susceptible to determination in the light of business and economist testimony and exhibits, and cross-examinations concerning analyses and underlying assumptions. Such matters are not to be determined exclusively by reasoning in the abstract, based upon logical speculation.
 
 
 154
 This is not to say that a full-scale evidentiary inquiry was required in this case. We have already held that the Commission did not err in failing to hold a formal hearing on the Department's written submissions. But it was incumbent upon the Commission to secure an adequate data base for its predictions as to trade disruptions in the absence of Agreement 10140. It was not entitled to accept at face value the conclusory predictions of the Agreements' proponents. "While we recognize that agency expertise is to be accorded deference and that the Commission can correct present errors, neither of these principles can substitute for the adequate evidentiary basis upon which the Commission's findings must rest."[83]
 
 
 155
 We therefore remand the case to the Commission so that it can reconsider, in light of sufficient data, its prediction that the absence of Agreement 10140 would result in trade disruption sufficiently serious to justify the Agreement's anticompetitive effects.[84] The Commission should elicit from proponents whatever specific evidence there may be to support that prediction, and should permit the Department an appropriate opportunity to evaluate that evidence.[85] We leave it to the judgment of the Commission to determine the form of the procedures to be employed on remand. City of Huntingburg, Indiana v. FPC, 162 U.S.App.D.C. 236, 498 F.2d 778, 789 (1974).
 
 V. CONCLUSION
 
 156
 The Commission has jurisdiction under section 15 of the Shipping Act to review a rate agreement between all-water carriers and rail/ocean carriers who service the same trade. This falls within the scope of section 15 as an agreement between persons subject to the Act that affects competition in connection with ocean transportation. Commission jurisdiction over the agreement does not conflict with ICC jurisdiction over land carriage, for the ICC retains power over inland rates.
 
 
 157
 The Department of Justice, suing in its law enforcement capacity, may challenge the order approving this agreement by invoking the Hobbs Act's judicial review provision in favor of a "party aggrieved." The Department qualifies as such a party because it participated below and because the Commission approval of the rate agreement directly interferes with the Department's statutory duty to enforce the antitrust laws. The Department's simultaneous statutory involvement in the defense of Commission orders is at most a surface anomaly that does not materially interfere with an effective agency defense. Nor is there otherwise any persuasive indication that Congress meant to preclude the Department from seeking judicial review of the orders of Hobbs Act agencies. And, this case is constitutionally justiciable inasmuch as there is concrete adverseness between the parties and the controversy is of the sort traditionally resolved by courts.
 
 
 158
 Although the Commission was not required to hold an adversarial evidentiary hearing in this case, it was required to marshal sufficient data to support its factual, predictive conclusions. Because the Commission did not base its expert judgment on a set of sufficient and specific facts, but instead relied solely on the unsubstantiated conclusions of the Agreement's proponents, we remand to the Commission for elicitation of pertinent facts and reconsideration of the factors relevant to the public interest.
 
 
 159
 Judgment accordingly.
 
 
 160
 WALD, Circuit Judge, concurring in part and dissenting in part.
 
 
 161
 I concur in Judge MacKinnon's exhaustive discussion concluding that the Department of Justice ("the Department" or "Justice") has the statutory and constitutional requisites to petition for the reversal of the Federal Maritime Commission's ("the Commission" or "the FMC") order approving Agreement No. 10140. I concur, too, in his decision to remand the order to the Commission so that it can reconsider and substantiate its conclusion that the agreement is necessary to protect the members of the Gulf-United Kingdom Conference from destructive competitive influences.[1]
 
 
 162
 But I would go further than the majority opinion does and require the Commission, on remand, to conduct a detailed inquiry into the anticompetitive aspects of the agreement so that it can make an informed judgment as to 1) whether it serves a valid transportation need and, more fundamentally, 2) whether it is authorized by section 15. My understanding of the law is that the Commission has a clear statutory responsibility to make a detailed record of the anticompetitive effects of a price fixing agreement prior to deciding whether the agreement will be "in the public interest." This requirement exists even in the absence of a jurisdictional challenge, but becomes particularly essential when the Commission's basic authority to approve an agreement is put in issue. See Federal Maritime Board v. Isbrandtsen, 356 U.S. 481, 499, 78 S.Ct. 851, 862, 2 L.Ed.2d 926 (1958) ("precise findings by the Board as to a particular system's intent and effect ... essential to a judicial determination of the system's validity under the statute"). The fact that this agreement, with its far-reaching potential for abrogating competition in transportation industries beyond ocean carriers, straddles the outer boundary of section 15 jurisdiction accentuates the need for a complete record; only a detailed record is capable of justifying the expansion of inherently anticompetitive practices into new transportation modes at a time when the legislative and administrative trend is very much in the opposite direction.[2]
 
 
 163
 I cannot decide from this sparse record, consisting primarily of self-serving affidavits by the Secretary of the conference agreement in question, whether the "intent and effect" of Agreement No. 10140 are such as to take it outside the broad grant of antitrust immunity accorded by section 15. The Department argues fervently that agreements such as this one go far beyond the intended scope of section 15 when they eliminate competition (1) between conference and independent carriers, (2) between ocean and intermodal routes, and (3) between intermodal operators rather than ocean carrier operators. Its argument is persuasive, and deserved considerably more attention than it received from the Commission.
 
 I. THE SCOPE OF SECTION 15
 
 164
 Whether such an agreement properly falls within the scope of the antitrust immunity conferrable by the Commission pursuant to section 15 is a difficult and novel question. Neither the statute on its face, the circumstances surrounding its passage, nor subsequent interpretations of it reveal any clear answers.
 
 A. The Statutory Language
 
 165
 Section 15 applies to agreements between "[e]very common carrier by water, or other person subject to this chapter ...." 46 U.S.C. Sec. 814. The statute defines the term "common carrier by water" as "a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port." 46 U.S.C. Sec. 801. "Other person subject to this chapter" refers to any person not included in the definition of "common carrier by water" "carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." Id.
 
 
 166
 United States Lines ("USL") and Seatrain, the intermodal carriers, are clearly "common carrier[s] by water" to the extent that their ships take goods from east coast United States ports to the United Kingdom. In holding that they are common carriers by water for the inland portion of their transport as well, the FMC relies heavily on the fact that both operations are carried out under the same corporate umbrella; in its brief, it focuses on the fact that the agreement is "among FMC-regulated ocean carriers." Brief for Respondent FMC at 28 n. 31.
 
 
 167
 However, the limitation in the Shipping Act's definition of a common carrier by water to one engaging in commerce "on the high seas or the Great Lakes on regular routes from port to port," 46 U.S.C. Sec. 801 (emphasis supplied), casts doubt on whether the intermodals' inland operations are to be covered. It suggests that a type of activity rather than an entity is the basis of the FMC's jurisdiction.
 
 
 168
 The definition of "other carrier subject to this chapter" as one engaged in "forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities," id. (emphasis supplied), also seems to limit the application of section 15. Since Congress specifically enumerated the "others" it thought should be covered by the Act, it would not be unreasonable to conclude that this list is exclusive, and does not include the inland transport activities of the ocean carriers from the FMC's jurisdiction. The Department's contention that the FMC's interpretation of section 15 would allow the FMC to bootstrap the authority to regulate the auto production activities of a conglomerate from its ownership of an ocean transport firm may stretch the argument too far, see Maj.Op. at n.59; however, it does point out that the outer reach of the statutory language is far from clear.
 
 B. The Legislative History of Section 15
 
 169
 There are, to be sure, indications in the Alexander Report[3] that the proposed legislation should encompass water-rail through hauls.[4] These recommendations, however, were made on the assumption that the ICC, which already had regulatory jurisdiction over railroads, would regulate ocean carriers as well. The bills ultimately passed by Congress, and enacted as the Shipping Act, 1916, 46 U.S.C. Secs. 801-842, however, did not give section 15 jurisdiction to the ICC but created a new Shipping Board to supervise carrier agreements, with jurisdiction, discussed above, over "common carriers by water" only. Furthermore, Congress specifically said in section 33 of the same Act, 46 U.S.C. Sec. 832, that such jurisdiction was "not to be construed to affect the power or jurisdiction of the Interstate Commerce Commission, nor to confer upon the Board concurrent power or jurisdiction over any matter within the power or jurisdiction of such Interstate Commerce Commission."[5] (Emphasis supplied). Thus the Alexander Report recommendations are a dubious basis for finding that Congress intended to include intermodal agreements in section 15's orbit.[6]
 
 C. Judicial Interpretations of Section 15
 
 170
 I have been unable to find any judicial precedent which clearly supports the proposition that conferences may legally set intermodal through rates for their own members, let alone any which says that conferences may set such rates for the independent nonconference members that ordinarily do business in competition with conference members. Even the FMC, which has asserted authority to approve intermodal rates in approximately 50 cases, admits that "[t]he courts have [only] implicitly recognized FMC jurisdiction over agreements concerning transportation by both FMC and ICC carriers." In re: Agreement Nos. 150 DR-7 and 3103 DR-7, 19 S.R.R. 1229, FMC Docket No. 76-11, slip op. at 14 n.12 (Dec. 31, 1979).
 
 
 171
 The case upon which the majority primarily relies, Port of New York Authority v. FMC, 429 F.2d 663 (5th Cir.1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971), approved only the absorption of port terminal charges by shipping conferences and the proportional ocean portion of through intermodal routes. The appeal did not raise any questions going to the FMC's jurisdiction over through rates. Although Seatrain International, S.A. v. FMC, 189 D.C.App. 388, 584 F.2d 546 (1978), appeal after remand, 194 U.S.App.D.C. 370, 598 F.2d 289 (1979), dealt with intermodal rates set by a conference, the court never decided the jurisdictional issue. The court remanded the case to the FMC on each occasion due to its failure to adequately consider the antitrust implications of the involved intermodal rate agreement.
 
 
 172
 The other cases cited by the majority in support of its expansive reading of section 15, see Maj.Op. 813-17, are equally inapposite; they deal with altogether different issues such as labor agreements and brokerage commissions. There is no question but that section 15 is a double edged sword. It guarantees FMC scrutiny of maritime-related conduct, but it also immunizes approved agreements from antitrust strictures. Thus, reasons exist to read section 15 expansively in some instances, i.e., to insure FMC scrutiny of maritime-related activities and narrowly in others, i.e., where its grant of antitrust immunity means the carriers will be subjected to far less scrutiny than if it did not apply in borderline situations. This case is obviously in the latter category. But see Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 274-75, 88 S.Ct. 929, 936-37, 19 L.Ed.2d 1090 (1978) (advocating broad reading of section 15).
 
 
 173
 D. Collateral Statutory Limitations on Section 15: Section 33
 
 
 174
 I cannot dismiss as easily as the majority the argument that section 33 of the Shipping Act, 46 U.S.C. Sec. 832, which withholds from the FMC "concurrent power or jurisdiction of [the] Interstate Commerce Commission,"[7] may in fact be violated by the Commission's approval of Agreement No. 10140, but would have the hearing on remand go into that issue more thoroughly. The FMC's assertion of jurisdiction over the through intermodal rates of Agreement No. 10140 rests on the assumption, adopted by the majority opinion, that there is no functional difference between permitting the ocean carriers to agree on the ocean division proportion of a joint through fare (the Department does not contest that power) and permitting them to agree on joint intermodal through fares since in each case each intermodal member has to make its own arrangement with the land carrier as to the ICC-regulated land division proportional rate. See Maj.Op. at 813-14. I agree with the Department that agreements on joint intermodal through fares (which include surface land rates) may have a significantly different anticompetitive effect on shippers and carriers than simple agreements on the proportion of payments from an intermodal fare that go to the ocean division. That a difference may exist is all the more likely now that ICC policy, exercised pursuant to new legislation, frowns heavily on collective setting of the landbased rates and aggressively promotes competition as to such rates.
 
 
 175
 While the record before us is too bare to support any final conclusions, I can envision several repercussions from allowing ocean carriers and intermodal carriers to agree on joint through rates. If railroads cannot collectively set the inland division in their negotiations with shippers, shippers may gain price advantages through competition on that portion of the route. If Agreement No. 10140 were not in effect, those same shippers might obtain a lower total rate by adding the agreed upon ocean rate to the individually negotiated land rate, or they might comparison shop between the ocean-only rate and the intermodal rate. But because Agreement No. 10140 sets the same total through rates for all minibridge and water carriers who are parties to the agreement affecting both all-water routes and intermodal routes, it provides no incentive for the shippers to shop for a bargain or for the railroads, who are supposed to compete for the shippers' business, to try and reduce their costs. The only negotiable point would be between the individual railroads and the individual ocean carriers as to their proportional divisions of the uniform through rate. I have no idea whether such competition could or would develop; I do know one cannot judge whether the ICC's regulatory jurisdiction over the railroad leg of the trip is effectively undermined without knowing more about what would happen to existing patterns of competition under such circumstances.[8] Moreover, this limited potential for competition differs significantly from the potential that exists when carriers can agree only on the ocean division, leaving the shippers free to partake of any benefits accruing from the railroads' competition for their business.
 
 
 176
 In sum, I find the question of the scope of section 15 a difficult one, one which no court has ever expressly considered. It is too important a question to be finally decided in this case on the puny record provided by the Commission. Rather, the full implications of immunity for intermodal tariff agreements should be carefully reviewed in light of the origins and purpose of that section and the Act as a whole.
 
 
 177
 II. THE COMMISSION'S BURDEN UNDER THE Svenska DOCTRINE
 
 
 178
 Assuming arguendo that the Commission has jurisdiction to approve intermodal conference agreements, it cannot do so without engaging in a more extensive inquiry, resulting in more detailed findings of facts, than it did in this case. The Supreme Court, accepting the FMC's own interpretation of its statutory mandate to disapprove agreements that it finds to be "contrary to the public interest," places on the proponents of an anticompetitive agreement the burden of " 'bring[ing] forth such facts as would demonstrate that the ... rule was required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act.' " FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 243, 88 S.Ct. 1005, 1008, 19 L.Ed.2d 1071 (1968). Moreover, "once an antitrust violation is established," this burden cannot be satisfied "unless other evidence in the record detracts from the weight of this factor." Id. at 246, 88 S.Ct. at 1010. In my view, this means that, once triggered by an acknowledgedly anticompetitive agreement such as this one, the Commission may not confine its inquiry to the justification for the agreement, but must explicitly balance this justification against the agreement's anticompetitive costs. Such balancing cannot take place without an initial exploration of the extent of these costs, an exploration that is the Commission's responsibility to perform rather than a burden resting on the opponents of the agreement.
 
 
 179
 That this is the proper interpretation of Svenska is made clear in another case decided that term, Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 273, 88 S.Ct. 929, 936, 19 L.Ed.2d 1090 (1968), in which the Court emphasized that a broad reading of section 15 is tied to the Commission's duty "to consider the antitrust implications" of the agreements it approves. Moreover, this court has repeatedly adhered to this interpretation. In Seatrain International, S.A. v. FMC (Seatrain I), 189 U.S.App.D.C. 388, 584 F.2d 546 (1978), we remanded to the Commission an order approving an intermodal tariff agreement between conference members because of its failure to adequately explore its antitrust implications saying,
 
 
 180
 [the Commission] must conduct whatever proceedings are necessary for it to secure sufficient information so that its final decision will reflect "a consideration of the relevant factors."
 
 
 181
 Id. at 392, 584 F.2d at 550. One of these factors was the agreement's "likely anticompetitive effects." Id. 391, 584 F.2d at 549. In Seatrain International, S.A. v. FMC (Seatrain II), 194 U.S.App.D.C. 370, 598 F.2d 289 (1979), the court again remanded the same order to the Commission for its continued failure to "perform its duties with a full understanding of the economic and commercial situation." Id. at 295. The court warned the agency,
 
 
 182
 [a]ntitrust considerations thus must be fully considered and anticompetitive agreements can be approved only if there are "serious" and "important" advantages for the public.
 
 
 183
 Id. 374, 598 F.2d at 293. In United States Lines, Inc. v. FMC, 189 U.S.App.D.C. 361, 584 F.2d 519 (1978), furthermore, this court explicitly rejected the argument that the FMC need only consider the evidence of anticompetitive effects put forward by the opponents of an agreement, calling the FMC's duty to investigate the antitrust implications of agreements an "independent statutory responsibility." Id. 373, 584 F.2d at 531.
 
 
 184
 The Commission itself seems to have admitted in other cases that it must explore the noncompetitive consequences of agreements before it can decide if they are "justified." See Brief for Respondent FMC at 34 ("The scope and depth of proof required for approval varies from case to case in relation to the degree of invasion of the antitrust laws."); Agreement No. 57-96--Pacific Westbound Conference--Extension of Authority for Inter-Modal Services, 19 F.M.C. 291, 300 (1975); Agreement No. 8760-5--Modification of the West Coast United States & Canada/India, Pakistan, Burma & Ceylon Rate Agreement, 17 F.M.C. 61, 62 (1973).
 
 
 185
 However, the Commission has patently failed to meet this "independent statutory responsibility" in this case. Although in 1977, just one year earlier, the FMC limited an extension of the involved agreement to one year because it "determined that a closer examination is needed regarding agreements between all water carriers and minibridge carriers," J.A. 35, in 1978, this "closer examination" was reduced to a cursory glance. The FMC's sole bases for concluding that "[t]he actual anticompetitive effect of Agreement No. 10140 does not appear to be of major significance--it is most certainly not 'severe,' " J.A. 153, despite its recognition that "[a]s a price fixing agreement, Agreement No. 10140 is per se violative of the Sherman Act," J.A. 149, are conclusory statements unsupported by data, analysis, or even explanation.
 
 
 186
 The majority opinion accepts this conclusory "expert judgment" that any anticompetitive effects engendered by the agreement will be justified if the carriers survive; they remand only to decide whether the conference is truly threatened. See Maj.Op. at 821-24. They do so on the ground that no disputed fact questions were raised, that the Department's objections were merely economic and antitrust "theories." See id.
 
 
 187
 While it may well be that the Commission need not have a formal "on the record" evidentiary hearing, see United States Lines, Inc. v. FMC, 189 U.S.App.D.C. 361, 378-79, 584 F.2d 519, 536-37 (1978), in my view, it has to do more than it did to meet the Svenska burden. It must provide a record that explores, discusses, and investigates in detail the anticompetitive effects of this agreement. The implications of the decision are enormous; they deserve more attention than they received. Two areas in particular need further substantiation.
 
 A. The Effects on Intermodal Transportation
 
 188
 I find it difficult to understand how as critical an issue as the immunization from the antitrust laws of intermodal transportation can be decided without a full airing of the economic effects of this expansion of section 15 authority. The decision has the potential to significantly affect the economics of intermodal carriers, all-water carriers, conference carriers, and independent carriers.
 
 
 189
 Intermodalism, although existing in embryonic form in 1916 when the Shipping Act was passed, did not become a major factor in the transportation industry until the advent of containerization in the late 1950's. It has since been hailed as the wave of the future, in large part because it is supposed to lead to the reduction of shippers' costs. See Note, Containerization and Intermodal Service in Ocean Shipping, 21 Stan.L.Rev. 1077, 1090-91 (1969) ("Intermodal service offers the shipper both internal savings and procedural simplification .... The combination of containerization and intermodal service creates a reinforcing effect and provides savings and service options that neither could offer independently."). The nonconference carriers like Seatrain and United States Lines pioneered the transition to intermodalism; the carrier conferences, despite the FMC's encouragement, delayed implementation of intermodal innovations. Chief Judge Wright wrote in Seatrain II, 194 U.S.App.D.C. 370, 377, 598 F.2d 289, 296 (1979):
 
 
 190
 [i]t seems at best naive to expect a cartel, which has no more important purpose than preserving stability in its industry, to pioneer innovations .... Thus conferences might well be viewed as less effective vehicles for implementing intermodal service.
 
 
 191
 This agreement threatens to depress even further any incentive for conference members to enter into intermodal ventures by doing away with competition between water and intermodal carriers and artificially equalizing their rates.
 
 
 192
 The ultimate issue in this case is who, if anyone, will benefit from the admitted economies of containerization and intermodalism: shippers and their customers or the carrier cartels. See Final Report of the National Transportation Policy Study Commission: National Transportation Policies Through the Year 2000 at 286 (1979); Schmeltzer & Peavey, Prospects and Problems of the Container Revolution, 1 J.Mar.L. & Com. 211 (1970); Note Coordination of Intermodal Transportation, 69 Colum.L.Rev. 247, 252 (1969); Note, Containerization and Intermodal Service in Ocean Shipping, 21 Stan.L.Rev. 1077, 1095-96 (1969);[9] McGee, Ocean Freight Rate Conferences and the American Merchant Marine, 27 U.Chi.L.Rev. 191, 226 (1960).
 
 
 193
 Intermodal arrangements can embrace an infinite variety of combinations, including cross-country surface as well as international air hauls. By allowing all water conference carriers to agree with minibridge land and air carriers on through rates from any point of origin to any destination, the Commission is excluding from the reach of our antitrust laws and the free market a momentous transportation development, not remotely anticipated by the drafters of section 15 in 1916, without any kind of full airing of the effects of such insulation on the transportation industries, shippers and customers.
 
 
 194
 B. The Anticompetitive Possibilities of Agreement No. 10140
 
 
 195
 Agreement No. 10140 threatens not only to forestall the assimilation of technological innovation into the industry, but in so doing, to undermine any price competition which heretofore existed to limit the monopolistic tendencies of the carrier cartels. When Congress passed the Shipping Act, 1916, allowing the carrier conferences to set rates, it relied on the presence of independent nonconference carriers to assure that the conferences did not exploit the shippers.[10] See Alexander Report, supra note 3, at 298-300. The same concern for preserving independent carriers was evinced during the debates on the 1961 amendments to the Shipping Act, see Index to Legislative History of Steamship Conferences Dual Rate Law, S. Doc. 100, 87th Cong., 2d Sess. 425 (1962) (statement of Senator Kefauver), and has been noted by the Court, see Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 491, 78 S.Ct. 851, 858, 2 L.Ed.2d 926 (1958) ("The Congress in Sec. 14 [of the Shipping Act] has flatly prohibited practices of conferences which have the purpose and effect of stifling the competition of independent carriers."). By creating a binding agreement between independent minibridge operators and a conference to control both all-water and intermodal rates, Agreement No. 10140 not only prevents the development of intermodal routing by the conference, and the resultant trickling-down of benefits to shippers, but also eliminates the possibility that independents will pass on part of the savings engendered by intermodalism to the shippers. See Larner, Public Policy in the Ocean Freight Industry in Promoting Competition in Regulated Markets 103, 133 (Philips, ed. 1975) (advocating rejection of rate agreements between group carriers in one mode and individual carriers in another). Quite simply, it allows the conference to control the through rate of the intermodal service at the price prevailing on the water carrier routes. The independents' role as a potential brake on prices is thus destroyed.
 
 
 196
 It seems to me that Svenska requires that the Commission explore much more thoroughly than it did the extent of the effect of this agreement, with its potential for eliminating competitive restraints central to the Congressionally devised plan, on price and service. Any rational weighing of the benefits against the costs of Agreement No. 10140 requires the collection and analysis of data on its effect on competition (1) between water carrier conference members, (2) between minibridge operators, (3) between water carrier members and minibridge operators, and (4) between all of the above and Baltic carriers, as well as its repercussions on shippers and consumers.
 
 
 197
 Moreover, this agreement may run counter to a specific prohibition contained in the statute. Section 15 forbids the Commission to approve any agreement "between carriers not members of the same conference ... that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, ... retains the right of independent action." The FMC and Seatrain assert that the 48 hour "opt-out" provision of the agreement sufficiently preserves "the right of independent action" to meet the statutory mandate. J.A. 109-10. However, they back this assertion with little, and I might add, highly equivocal evidence.[11] Therefore, I would require the Commission to investigate the practical utility of the "opt-out" provision, and to issue findings on its conformity with section 15's "independent action" requirements.
 
 
 198
 Finally, it is becoming clear that Agreement No. 10140 has an anticompetitive "ripple effect." The FMC, we are informed, has authorized dual rate contracts for intermodal shipments covered by conference agreements. Because Congress specifically authorized dual rate agreements in 1961, the FMC is maintaining that these new agreements may be approved following a lesser showing of justification than that required by Svenska. See In re: Agreements Nos. 150 DR-7 and 3103 DR-7, 19 S.R.R. 1229, FMC Docket No. 76-11, slip op. at 21 (December 31, 1979). Therefore, water carriers may now agree with independent intermodals to set one through rate, thereby eliminating competition both between the intermodals party to the agreement and between the all-water and intermodal carriers. They also may set a special rate for shippers who agree to adhere to the conference-set intermodal rate rather than shop around the non-party intermodal carriers for the best price for individual shipments. This development accelerates the conferences' monopoly over the traffic on that route and limits the shippers' options still further by decreasing substantially the likelihood they can benefit in any instance from any of the inherent economies of containerization and intermodalism.[12]
 
 
 199
 In sum, I find it astounding that the FMC[13] and this court are willing to allow intermodalism, with its promise of greater efficiency and consumer savings, to be so swiftly and silently[14] subsumed under the conference mechanism with so little inquiry into the economic consequences of this development. I would require a searching inquiry into these consequences before sanctioning an agreement such as Agreement 10140. I would hold the Commission responsible for developing the data necessary to make findings about the foreseeable anticompetitive effects on the shipping industry, the expected effects upon the shippers, and the availability of more competitive alternatives. Only after such an inquiry would I feel comfortable passing on the thorny question of whether section 15 authorizes Agreement No. 10140.
 
 
 
 [1]
 United States v. FMC, 694 F.2d at 799-810. (D.C.Cir.1980)
 
 
 [2]
 Id. at 810-819
 
 
 [3]
 Compare id. at 819-824 with separate opinion at 795-803
 
 
 [4]
 Petition of Sea-Land Service, Inc., for Rehearing and Suggestion for Rehearing En Banc at 1-2 (filed Feb. 17, 1981)
 
 
 [5]
 Petition of United States for Rehearing and Suggestion for Rehearing En Banc at 1 (filed Feb. 17, 1981)
 
 
 [6]
 United States v. FMC, No. 79-1299 (D.C.Cir.) (order filed Mar. 13, 1981). The Supreme Court subsequently denied Sea-Land's petition for a writ of certiorari. Sea-Land Serv. v. United States, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981)
 
 
 [7]
 United States v. FMC, No. 79-1299 (D.C.Cir.) (order filed March 13, 1981)
 
 
 [8]
 See, e.g., United States v. FMC, No. 80-1251 (D.C.Cir.) (petition for review filed Feb. 29, 1980)
 
 
 [9]
 See A.L. Mechling Barge Lines v. United States, 368 U.S. 324, 329, 82 S.Ct. 337, 340-341, 7 L.Ed.2d 317, 321-322 (1961); United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 106-107, 95 L.Ed. 36, 40-41 (1950)
 
 
 [1]
 28 U.S.C. Sec. 2342(3)
 
 
 [2]
 Two intervenor briefs were filed, one by Sea-Land Service, Inc. in conjunction with the Gulf/United Kingdom Conference, and one by a group of several other ocean carrier conferences (hereafter referred to as intervening conferences)
 
 
 [3]
 The agreements required to be filed are those
 fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement.
 46 U.S.C. Sec. 814. Persons subject to the Act include common carriers by water and persons carrying on the business of forwarding or furnishing terminal facilities in connection with such a carrier. Shipping Act Sec. 1, 46 U.S.C. Sec. 801.
 
 
 [4]
 The Commission has approved amendments renewing the term of the Agreement several times since. See note 12 infra
 
 
 [5]
 Adherents to the Agreement carry about 65% of the traditional liner cargo in the Gulf/United Kingdom trade, but an appreciably lesser portion of the total cargo. Approval of FMC Agreement 10148-8 (August 30, 1978) (unpublished) at 4, reprinted in Joint Appendix (App.) at 151
 
 
 [6]
 Agreement Between the Gulf/United Kingdom Conference (FMC-161) and Seatrain International, S.A. art. 1, reprinted in App. at 184
 
 
 [7]
 A conference is a voluntary organization of ocean carriers servicing a particular trade who agree, under Commission approval, to limit competition among themselves. The members of the Gulf/United Kingdom Conference are Combi Line, Harrison Line, Lykes Bros. Steamship Co., and Sea-Land Service, Inc. These lines cooperate pursuant to FMC Agreement No. 161. See App. at 148 n. 1
 
 
 [8]
 Pending disposition of this petition for review, Seatrain inaugurated all-water service and became a member of the Gulf/United Kingdom Conference in May 1979. Approval of Commission Agreement No. 10140-12 (February 29, 1980) (unpublished) at 3
 
 
 [9]
 Intermodal routes are of two kinds: "minibridge" and "interior intermodal" (or "microbridge"). The inland leg of a minibridge route connects two ocean ports whereas the inland leg of an interior intermodal route connects a port with an inland shipping point. See Agreement No. 57-96, Pacific Westbound Conference Extension of Authority for Intermodal Services, 19 F.M.C. 291, 303 n. 15, 304 n. 16 (1976). The intermodal routes involved here are minibridge, but the issues raised by interior intermodal routes would seem to be no different. See id. at 304 n. 16
 
 
 [10]
 Various forms of common carrier rates are discussed more fully in Pennsylvania v. ICC, 182 U.S.App.D.C. 280, 561 F.2d 278, 281-83 (1978) and infra at pp. 811-812
 
 
 [11]
 Approval of Agreement 10140-8, supra note 5, at 6, reprinted in App. at 153. Provision for independent action is in accordance with Shipping Act Sec. 15:
 No [anticompetitive agreement between persons subject to the Act] shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreement between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action ....
 46 U.S.C. Sec. 814.
 
 
 [12]
 After initial approval for an 18 month period in 1975, the Agreement was renewed for another 4 months in 1976 and for yet another 14 months in 1977. Short-term renewals were approved pending disposition of the protest by the Justice Department. Approval of Commission Agreement 10140-8, supra note 5, at 2 n. 4, reprinted in App. at 149 n. 4. Pending this petition for review the Commission approved a further renewal until March 1, 1981. Conditional Approval of Commission Agreement 10140-12 (February 29, 1980) (unpublished) at 2
 Intervenors suggested at oral argument that the Department's latest approval of renewal has mooted this case. We disagree. Even an expiration of the Agreement would not have mooted the case, for it raises questions "likely to arise repeatedly," and " 'their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review.' " Seatrain Int'l, S.A. v. FMC, 194 U.S.App.D.C. 370, 598 F.2d 289, 292 (1979). Accord, United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315, 1319 (1973). The Commission's renewal of the Agreement makes this an a fortiori case for justiciability, for renewal assures the issues raised here relate to a live controversy.
 
 
 [13]
 The notice read in part:
 Interested parties may submit comments on each agreement, including requests for hearing.... Comments should include facts and arguments concerning the approval, modification, or disapproval of the proposed agreement. Comments shall discuss with particularity allegations that the agreement [should be disapproved, cancelled, or modified on the ground that it] is unjustly discriminatory or unfair ..., or operates to the detriment of the commerce of the United States, or is contrary to the public interest, or is in violation of the Act."
 
 
 [43]
 Fed.Reg. 4111 (1978), reprinted in App. at 7
 
 
 [14]
 App. at 85-105
 
 
 [15]
 Approval of Agreement 10140-8, supra note 5, reprinted in App. at 146-56
 
 
 [16]
 Id. at 6, reprinted in App. at 152. Shipping Act Sec. 15 requires filing of anticompetitive agreements among "common carrier[s] by water, [and] other person[s] subject to [the Shipping Act]." 46 U.S.C. Sec. 814
 
 
 [17]
 Approval of Agreement 10140-8, supra note 5, at 3-4, reprinted in App. at 148-49
 
 
 [18]
 Id. at 6, reprinted in App. at 153. An agreement unduly violative of antitrust policies would be deemed contrary to the public interest. FMC v. Atkiebolaget Svenska Amerika Linien, 390 U.S. 238, 243-46, 88 S.Ct. 1005, 1008-10, 19 L.Ed.2d 1071 (1968). Anti-Trust's nonjurisdictional objections to approval, both before the Commission and here, focus exclusively on the Agreement's anticompetitive effects
 
 
 [19]
 Id. at 8, 9, reprinted in App. at 155, 156. Further approvals have extended the Agreement to March 1, 1981. See note 12 supra
 
 
 [20]
 See p. 796 n.2 supra
 
 
 [21]
 E.g., United States v. FCC, 209 U.S.App.D.C. 79, 82 & n.10, 652 F.2d 72, 75 & n.10 (1980) (en banc) (Justice Department and three private parties appealed FCC order; court had jurisdiction under 47 U.S.C. Sec. 402(b)(6), permitting appeal by "any other person who is aggrieved or whose interests are adversely affected by" FCC order of the kind in question); United States v. CAB, 176 U.S.App.D.C. 269, 539 F.2d 748 (1976) (decided with Northwest Airlines v. CAB ) (Justice Department and two private parties petitioned for review of CAB order; court took jurisdiction, presumably under 49 U.S.C. Sec. 1486(a), subjecting CAB order to judicial review at behest of "any person disclosing a substantial interest in such order"); United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315 (1975) (Justice Department as sole petitioner challenged CAB order as being unduly anticompetitive; jurisdiction presumably rested on 49 U.S.C. Sec. 1486(a), supra ); United States v. FMC, 164 U.S.App.D.C. 66, 503 F.2d 157, cert. denied, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) (decided with American Mail Line Ltd. v. FMC ) (Justice Department and four private parties petitioned for review of FMC order under the Hobbs Act)
 All of these cases, except United States v. FMC, may be distinguished from the present case in that only the Hobbs Act makes the Attorney General a party respondent and gives him responsibility for and control over the "interests of the Government." And United States v. FMC is itself arguably distinguishable on the basis that there the United States was not the only petitioner. See note 22 infra and accompanying text.
 
 
 [22]
 In every case but one, the United States was but one of several petitioners. In that exceptional case, United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315 (1975), it appears that the Department's authority to seek review was not challenged, and the issue of the Department's standing was not discussed
 
 
 [23]
 Unless barred by statute, the Government is not less entitled than any other shipper to invoke administrative and judicial protection
 United States v. ICC, 337 U.S. 426, 431, 69 S.Ct. 1410, 1413, 93 L.Ed. 1451 (1948). And the Hobbs Act clearly entitles aggrieved shippers to judicial review of Maritime Commission approvals of rate agreements. The Justice Department in such a case would assume the role of the Government's representative under provisions that generally give the Department control over litigation to which United States is a party, or in which the United States is interested. See 28 U.S.C. Secs. 516, 518(b), 519.
 
 
 [24]
 See Associated Industries v. Ickes, 134 F.2d 694, 699 (2d Cir.), vacated on other grounds, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943): agency could not deny that petitioner who participated in proceedings below was a "party."
 
 
 [25]
 The Department's position, however superficially appealing, amounts to a statement that any party to an administrative proceeding may gain judicial review under a "party aggrieved" provision if he is displeased with the proceeding's outcome. That is not the law. Although participation in the proceeding below may be an inflexible prerequisite to be a "party aggrieved" under the Hobbs Act, see, e.g., Gage v. AEC, 156 U.S.App.D.C. 231, 479 F.2d 1214, 1218 & n. 14 (1973), it does not follow that participation in and of itself provides a springboard for judicial review, for the party still must meet judicial standing requirements. See, e.g., Independent Investor Protective League v. SEC, 495 F.2d 311, 312-13 (2d Cir.1974); Chemehuevi Tribe of Indians v. FPC, 160 U.S.App.D.C. 83, 489 F.2d 1207, 1212 n.12, vacated on other grounds, 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975) and authorities cited therein
 
 
 [26]
 The Washington Utilities court held that a state utilities commission had standing under the Hobbs Act to challenge an FCC order; the commission was statutorily obligated to advocate consumer interests that were affected by the FCC order. At least two other cases suggest a similar analysis with respect to federal agencies. In United States ex rel. Chapman v. FPC, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953), the Supreme Court held the Secretary of Interior had standing to challenge a Federal Power Commission grant of a construction license to a private power company in an area assertedly reserved for construction of a public power plant. The relevant review provision was 16 U.S.C. Sec. 825l(b), which provided judicial review to "[a]ny party ... aggrieved by an [FPC order]." The Court did not make express the basis for its holding, but noted without comment the Secretary's argument that the private licensee's plan would adversely affect a "specific interest" of the Secretary inasmuch as he had the statutory duty to market public power so as to "encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." Id. at 155-56, 73 S.Ct. at 611-12
 A second case suggesting that a particular arm of the federal government suffers injury in fact by virtue of agency action infringing upon its interpretation of its specific regulatory interests is Koniag, Inc. v. Andrus, 188 U.S.App.D.C. 338, 580 F.2d 601 cert. denied, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713 (1978). In Koniag we held that the U.S. Fish and Wildlife Service and the Forest Service could appeal as "parties aggrieved" from a BIA decision that certain Indian villages could take unrestricted federal land. These agencies, we noted, "have broad mandates to protect our forests and wildlife ... [and are] those most likely in fact to have a legitimate concern about these lands and to come forward to protect the public interest." Id. at 605. The agencies had standing because unqualified taking from unrestricted land might compel other villages to choose refuge or forest land. Id. at 607. Although Koniag involved an intra-agency appeal and there thus was no occasion to apply "strict judicial standing requirements," id. at 606, its logic extends to a case of judicial review.
 
 
 [27]
 See 15 U.S.C. Secs. 4, 9, 15a
 
 
 [28]
 See the description of the Agreement, TAN 6, and the Commission's own discussion: "As a price fixing agreement, Agreement No. 10140 is per se violative of the Sherman Act and the burden is therefore on the Proponents to justify its continuance for another term." Approval of Agreement 10140-8, supra p. 796 n.5, at 2, reprinted in App. at 149
 
 
 [29]
 But see Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72-81, 98 S.Ct. 2620, 2629-34, 57 L.Ed.2d 595 (1978) (summarizing standing requirements without mentioning the "zone of interests" requirement); K. Davis, Administrative Law Treatise (Supp.1980) Sec. 22.19-1 at 185-86 (Duke Power "contribut[es] to the view ... that the 'zone' test has been allowed to die," leaving the injury-in-fact inquiry the only test for standing); id. at 22.02-11
 
 
 [30]
 The landmark case was Associated Industries v. Ickes, supra p. 800 n.24, which held that non-official persons can be authorized by Congress to challenge unlawful agency action; they "are, so to speak, private Attorney Generals." 134 F.2d at 704
 Holdings that the Attorney General generally lacks standing to enforce civil rights statutes on behalf of private citizens, e.g., United States v. Philadelphia, 482 F.Supp. 1248 (E.D.Pa.1979), are distinguishable on the ground that in such cases the Justice Department does not qualify as a party expressly authorized to sue, see id. at 1258, and on the further ground that the relevant legislative history indicates a congressional intent to preclude Justice Department suit, compare id. at 1260-61 with Part II.A.2. infra.
 
 
 [31]
 See, e.g., Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 12, 420 F.2d 577, 580 (1969)
 
 
 [32]
 See, e.g., Volkswagenwerk v. FMC, 390 U.S. 261, 268, 88 S.Ct. 929, 933, 19 L.Ed.2d 1090 (1968), Seatrain Int'l, S.A. v. FMC, 189 U.S.App.D.C. 388, 584 F.2d 546, 549 n. 11 (1978), United States Lines v. FMC, 189 U.S.App.D.C. 361, 584 F.2d 519, 527 n. 23 (1978)
 
 
 [33]
 A subsequent attack by the Attorney General on a private arrangement approved by the Maritime Commission could be hampered by section 15's provision that "[e]very agreement ... under this section ... shall be excepted from the [antitrust] provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto." 46 U.S.C. Sec. 814
 
 
 [34]
 The agencies covered by the Hobbs Act are the Maritime Commission, the ICC, the Federal Communications Commission (which also has a judicial review provision of its own), and the Department of Agriculture
 
 
 [35]
 See H.R.Rep. No. 1619, 80th Cong., 2d Sess. 3-4 (1948) (explanation of provisions same as those eventually enacted in the Hobbs Act)
 
 
 [36]
 S.Rep. No. 355, 61st Cong., 2d Sess. 5-6 (1910)
 
 
 [37]
 Congress has not always found these rationales persuasive, for several agencies handle their own cases free of Justice Department supervision. Executive Order 12146, 44 Fed.Reg. 42657 (1979), however, establishes a Federal Legal Council consisting of the Attorney General and the representatives of up to 15 agencies. The Order creates a Litigation Notification System under which agencies with authority to litigate in court must notify the Attorney General about cases falling into certain designated categories
 
 
 [38]
 See Part II.A.1. supra
 
 
 [39]
 The portion of Judge Phillips' testimony that we have placed in brackets was omitted from intervenors' extract
 
 
 [40]
 H.R. 2915 (relating to orders of the Federal Communications Commission and the Department of Agriculture) and H.R. 2916 (relating to orders of the ICC and the Maritime Commission, which was the predecessor to the FMC) were consolidated in H.R. 5487, which became the Hobbs Act. The House Report on H.R. 5487 refers to the House Judiciary Committee hearings on the previous bills as part of its legislative history. H.R.Rep. No. 2122, 81st Cong., 2d Sess. 3 (1950)
 
 
 [41]
 Report 1619 was on H.R. 1468, which preceded H.R. 2915 and the final bill, H.R. 5487. See note 40 supra. Report 1619 was alluded to in the House Report on H.R. 5487, H.R.Rep. No. 2122, 81st Cong., 2d Sess. 3 (1950)
 H.R. 1468 originally would have changed prior law by providing that the ICC or the Maritime Commission (a predecessor to the present Commission) would be the party respondent, with the Department of Justice having right of intervention. Amendments suggested in Report 1619 would have preserved prior law by reversing these roles. The statement of "Additional Views" dissented from those amendments reasoning that in light of significant and recurring disagreements between the Department and the Commission the better practice would be to make the Commission the party respondent.
 
 
 [42]
 Three Justices dissented from the Court's further holding that courts had jurisdiction to review ICC orders that denied reparation
 
 
 [43]
 See, e.g., Cannon v. University of Chicago, 441 U.S. 677, 696-98, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979) (Congress enacting sex discrimination statute (Title IX) patterned after race discrimination statute (Title VI) presumed to be aware of and to adopt lower court holdings inferring a private cause of action under Title VI); Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (Congress adopting new law that incorporates sections of prior law is presumed to be familiar with and to adopt judicial interpretations given to the incorporated sections); Georgia v. United States, 411 U.S. 526, 532-33, 93 S.Ct. 1702, 1706-07, 36 L.Ed.2d 472 (1973) (re-enacting Congress presumed to adopt Supreme Court interpretation of statute where interpretation was discussed in committee hearings). See generally 2A C. Sands, Sutherland on Statutory Construction Sec. 49.09 and cases cited (4th ed. 1973)
 
 
 [44]
 For more detailed discussion of the Act's historical background and rationale, see, e.g., FMC v. Seatrain Lines, Inc., 411 U.S. 726, 736-39, 93 S.Ct. 1773, 1780-81, 36 L.Ed.2d 620 (1973); Trans-Pacific Freight Conf. of Japan/Korea v. FMC, 209 U.S.App.D.C. 27, 650 F.2d 1235, 1240-41 (1980); Latin America/Pacific Coast Steamship Conf. v. FMC, 150 U.S.App.D.C. 362, 465 F.2d 542, 548-49, cert. denied, 409 U.S. 967, 93 S.Ct. 269, 34 L.Ed.2d 234 (1972)
 
 
 [45]
 H.R.Rep. No. 1419, 87th Cong., 2d Sess., 2, 15 (1962), quoted in FMC v. Pacific Maritime Ass'n, 435 U.S. 40, 54, 98 S.Ct. 927, 935, 55 L.Ed.2d 96 (1978)
 
 
 [46]
 FMC v. Pacific Maritime Ass'n, 435 U.S. 40, 53, 98 S.Ct. 927, 935, 55 L.Ed.2d 96 (1978)
 
 
 [47]
 The list of agreements subject to section 15 appears in note 3 supra
 
 
 [48]
 Although the Supreme Court had upheld joint and proportional rates as lawful under the Interstate Commerce Act, Texas & P. Ry. v. ICC, 162 U.S. 197, 216, 217, 220, 221, 244, 16 S.Ct. 666, 674, 675, 676, 684, 40 L.Ed. 940 (1896), the ICC held in its 1908 decision that it would not permit the filing of ocean/rail joint rates because the ocean carriers were unregulated and their rates fluctuated rapidly. Cosmopolitan Shipping Co. v. Hamburg-American Packet Co., 13 I.C.C. 266 (1908)
 
 
 [49]
 Pennsylvania v. ICC, supra note 10, 561 F.2d at 283
 
 
 [50]
 The ICC reversed its policy because (1) the Shipping Act of 1916 placed ocean carriers under a regulatory scheme, and (2) the rapid growth of containerization since its inception in 1957 had increased the efficiency and benefits of intermodal through transportation. Id. at 283
 
 
 [51]
 In Disposition of Container Marine Lines Through Intermodal Container Freight Tariffs, 11 F.M.C. 476 (1968), the Commission ruled that existing ocean carrier conference agreements did not authorize the adoption of joint through rates with inland carriers. The Commission intimated it would exercise jurisdiction to accept such rates, though, even though they involved, in the inland carriers, persons not subject to the Commission's jurisdiction. Id. at 490 n. 13. Soon thereafter, in Atlantic & Gulf/West Coast of South America Conf. Agreement No. 2744-30, 13 F.M.C. 121 (1969), the Commission stated:
 At present we believe that the Federal Maritime Commission has the authority and regulatory responsibility to accept such [joint through] rates for filing; but to avoid any uncertainty or confusion and to establish coordination of regulation, we instituted our rulemaking proceeding. Consequently, the determination of this issue must await the outcome of that proceeding.
 Id. at 131. The proceeding referred to produced 46 C.F.R. Sec. 536.8 (see note 52 infra ), which expressly asserts Commission jurisdiction over the filing of joint through rates.
 
 
 [52]
 Sec. 536.8 Tariffs containing through rates and through routes
 (a) Definitions. The following definitions shall apply for purposes of this section.
 (1) Through route. An arrangement for the continuous carriage of goods between points of origin and destination, either or both of which lie beyond port terminal areas;
 (2) Through rate. A rate expressed as a single number representing the charge to the shipper by a carrier or carriers holding out to provide transportation over a through route;
 (3) Joint rate. A through rate in which two or more carriers participate by agreement for the offering of through transportation service over a through route.
 (4) Participating carrier. Any carrier holding out to perform a transportation service over a through route.
 (b) Filing requirements. Every carrier or conference shall file tariffs stating all through rates, charges, rules, and regulations governing the through transportation of freight between ports or points in the United States and ports or points in a foreign country in which such carrier or conference participates. Such tariffs shall include the names of all participating common carriers, the established through route, a description of the service to be performed by each participating common carrier, and clearly indicate the division, rate or charge to be collected by the water carrier subject to the Act for its port-to-port portion of the through service, which division, rate or charge shall be treated as a proportional rate subject to the provisions of the Act. Such tariffs will be filed and maintained in the manner provided in section 18(b) of the Act, and the rules of this part. A memorandum of every arrangement to which a carrier subject to the Act, or conference of such carriers, is or becomes a party, for transportation between a port or point in the United States and a port or point in a foreign country, establishing any joint rate which is offered in connection with any common carrier, shall be filed concurrently with the filing of the through rate tariffs.[1]
 
 
 [1]
 Arrangements subject to section 15 of the Act must also be filed and approved in accordance with the requirements of General Order 24 (Part 522 of the Commission's rules).
 (Emphasis added.)
 
 
 [53]
 In re Agreement Nos. 150 DR-7 and 3130 DR-7, FMC Docket No. 76-11, slip op. at 10 n. 8 (December 31, 1979)
 
 
 [54]
 At least 24 agreements extending an ocean carrier conference's ratemaking authority to intermodal traffic had been approved as of mid-1975. Agreement No. 57-96, Pacific Westbound Conference Extension of authority for Intermodal Services, 19 F.M.C. 291, 301 n. 14 (1975). And over 50 section 15 agreements pertaining to through intermodal transportation had been approved through 1979. In re Agreement Nos. 150 DR-7 and 3103 DR-7, FMC Docket No. 76-11, slip op. at 14 n. 12 (December 31, 1979)
 
 
 [55]
 While the FMC accepts joint through rates for filing, it requires only that the ocean carrier's division be set forth clearly, and limits its substantive regulation (exercised through its disapproval power) to that division. See 46 C.F.R. Sec. 536.8 (1979), note 52 supra; Pennsylvania v. ICC, supra note 10, 561 F.2d at 291-92
 
 
 [56]
 E.g., Investigation of Overland and OCP Rates and Absorptions, 12 F.M.C. 184 (1969), aff'd sub nom. Port of New York Auth. v. FMC, 429 F.2d 663 (5th Cir.1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971)
 
 
 [57]
 See cases cited p. 816 infra
 
 
 [58]
 Also involved in the case was the question whether the Pacific conferences' previously approved rate-making agreements authorized the conferences to offer proportional rates for Midwest traffic that were lower than the local rates offered for Pacific Coast traffic. The Commission ruled that its predecessor had expressly authorized the making of such proportional rates. 12 F.M.C. at 215
 
 
 [7]
 This is putting it as strongly as possible; essentially the relevant transactions between conferences and railroads involved only the exchange of information. Any direct requests for railroad rate action were made only by individual ocean carriers, in the same way that shippers and individual rail carriers made such requests
 
 
 [8]
 There is no need to consider any agreement among the ocean carriers to enter into a joint agreement with third parties, as an agreement separate from the joint agreement itself, any more than it is appropriate to consider the arrival at an agreement to enter into an agreement among themselves; in either case the ultimate agreement is normally the one requiring sec. 15 consideration. The existence of parties thereto not subject to the Act does not affect Commission jurisdiction of the agreement as one among parties who are subject to the Act
 
 
 [59]
 For the Commission it was sufficient that Agreement 10140 was an anticompetitive agreement between persons subject to the Shipping Act. Approval of Agreement 10140-8, supra note 5, at 3-4, reprinted in App. at 150-51. In its only arguable departure from that principle, the Supreme Court held in FMC v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973) that section 15 did not apply to a one-time merger agreement that required no continuing Commission supervision, effectively destroyed one of the two parties to the agreement, and did not clearly fall within any of the seven categories of anticompetitive agreements listed in section 15, quoted in note 3 supra. The Department complains that "[i]f the Commission approach to section 15 were adopted, it would have jurisdiction to approve and immunize a price-fixing agreement for automobile manufacturing enterprises operated by ocean carriers. Such a result would be absurd." Pet.Br. at 15. At the risk of tarrying on what is no more than a law school hypothetical, we note that, should such a situation arise, the scope of section 15 might appropriately be confined, through a reading of its legislative history, to matters concerning competition in ocean transportation. See generally FMC v. Seatrain Lines, Inc., supra. In any event the proponents of such an agreement would have a nearly impossible burden under section 15's "public interest" standard as elaborated in FMC v. Atkiebolaget Svenska Amerika Linien, 390 U.S. 238, 243, 88 S.Ct. 1005, 1008, 19 L.Ed.2d 1071 (1968). Here as elsewhere, the Department's antitrust arguments are misdirected; they are relevant to propriety of Commission approval, not assumption of Commission jurisdiction
 
 
 [60]
 The stated purpose of Sec. 33 was "to obviate a conflict of jurisdiction if in some unforeseen manner any substantive provision of ... [the Shipping Act] inadvertently overlaps a corresponding provision of the interstate commerce act." H.R.Rep. No. 659, 64th Cong., 1st Sess. 14 (1916)
 Trailer Marine Transport Corp. v. FMC, 195 U.S.App.D.C. 201, 215 n.61, 602 F.2d 379, 393 n. 61 (1979).
 
 
 [61]
 E.g., Trailer Marine Transport Corp. v. FMC, supra note 60, 602 F.2d at 393 (IC Act conferral on ICC of jurisdiction over both land and sea portions of interstate shipping trade could settle matter against Maritime jurisdiction over such trade by virtue of Sec. 33)
 
 
 [62]
 The ICC has provided by regulation, at 49 C.F.R. Sec. 1300.67 (1979) and again in nearly identical language at 49 C.F.R. Sec. 1307.49 (1979) as follows:
 Sec. 1300.67 Export and import traffic--ocean carriers.
 (a) Ocean carriers not subject to Act. Common carriers by water, or conferences of such carriers, engaged in the foreign commerce of the United States, as defined in the Shipping Act, 1916, that operate between ports of the United States and foreign countries are not subject to the terms of the Interstate Commerce Act or to the jurisdiction of the Interstate Commerce Commission.
 (b) Through routes and joint rates.
 (1) A common carrier by railroad, pipeline, or water, or a common carrier by railroad jointly with a common carrier by motor vehicle, subject to the Interstate Commerce Act (hereinafter referred to in this section as the domestic carrier), may establish a through route and joint rate with a vessel-operating common carrier by water engaged in the foreign commerce of the United States (hereinafter referred to in this section as the ocean carrier), as defined in the Shipping Act, 1916, for the transportation of property between any place in the United States and any place in a foreign country. Every tariff naming such a through route and joint rate shall be filed with this Commission. The tariff may be filed in the name of the ocean carrier, a conference of ocean carriers, the domestic carrier or the duly appointed tariff publishing agent of such carriers.
 (2) The tariff shall be constructed, filed, and posted in conformity with the Interstate Commerce Act, and, except as otherwise specifically authorized, with the regulations in Parts 1300 and 1305 (regulations in both parts included in Tariff Circular No. 20) of this chapter. The tariff shall be printed in the English language, include the names of all participating carriers, a description of the services to be performed by each participating carrier, a statement of the joint rate, and a clear and definite statement of the division, rate or charge to be received by the domestic carrier for its share of the revenue covering a through shipment or aggregate of shipments under the tariff.
 (Emphasis added.) For the language of the corresponding FMC regulation, 46 C.F.R. Sec. 536.8 (1979), see note 52 supra.
 
 
 [63]
 See note 62 supra
 
 
 [11]
 If a + b = c, then c - a = b. Once "c", the through rate, and "a" the carrier division, are fixed, then "b" the inland division is merely a remainder, and determined by the others
 
 
 [64]
 Section 15 provides:
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this Act, and shall approve all other agreements, modifications, or cancellations.
 46 U.S.C. Sec. 814 (emphasis added).
 
 
 [65]
 Some agreements may be so "routine" or "de minimis" that they do not require filing, hearing and approval under section 15. Volkswagenwerk v. FMC, 390 U.S. 261, 276, 88 S.Ct. 929, 937, 19 L.Ed.2d 1090 (1968). Agreement 10140, however, clearly is neither routine nor de minimis
 
 
 [66]
 Shortly thereafter, Seatrain and other proponents of Agreement 10140 filed their reply to the Department's comments. See App. at 107, 117. It was on the basis of these written submissions and proponents' affidavits that the Commission reached its decision
 
 
 [67]
 Approval of Agreement 10140-8, supra note 5, at 8, reprinted in App. at 155
 
 
 [68]
 The Department's arguments below were, at most, the "legal and economic conclusions concerning market structure, competitive effect, and public interest" that we found insufficient to require an evidentiary hearing under analogous circumstances in United States v. FCC, 209 U.S.App.D.C. 79, 96, 652 F.2d 72, 89 (1980) (en banc). The Department's proposal that the Commission routinely hold a hearing before approving price-fixing agreements would result in an evidentiary hearing in virtually every section 15 case, compare United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (price-fixing entails "raising, depressing, fixing, pegging, or stabilizing the price of a commodity") with Shipping Act Sec. 15, quoted in note 3 supra, and would thus, contrary to our holdings in Seatrain Int'l, S.A. v. FMC, supra, 189 U.S.App.D.C. at 392, 584 F.2d at 550 and United States Lines v. FMC, supra, 189 U.S.App.D.C. at 378-79, 584 F.2d at 536-37, "unduly limit the discretion the Commission must have in order to mold its procedures to the exigencies of the particular case." Gulf States Co. v. FPC, 411 U.S. 747, 762, 93 S.Ct. 1870, 1879, 36 L.Ed.2d 635 (1973); see generally United States v. FCC, supra, 90-91
 
 
 [69]
 Approval of Agreement 10140, supra note 5, at 9, reprinted in App. at 156
 
 
 [70]
 Id. at 4, reprinted in App. at 151
 
 
 [71]
 Id. at 5, reprinted in App. at 152
 
 
 [72]
 Id. at 4, 5 n. 10, reprinted in App. at 151, 152 n. 10. Tramp operators are exempt from FMC jurisdiction under Shipping Act Sec. 1, 46 U.S.C. Sec. 801
 
 
 [73]
 Id. at 6, reprinted in App. at 153 (footnote omitted)
 
 
 [74]
 Id. at 4, 5 n. 10, reprinted in App. at 151, 152 n. 10
 
 
 [75]
 [T]he [Commission] ... is an expert in the field and ... this court should not put its view against [it]. The great complexity of our economy induced Congress to place the regulation of businesses like foreign shipments in specialized agencies with broad powers. The courts are slow to interfere with the conclusions of such agencies when reconcilable with statutory directions
 New York Shipping Ass'n, Inc. v. FMC, No. 78-1479, slip op. at 11 (D.C.Cir. Sept. 11, 1980) (quoting Transamerican Trailer Transport v. FMC, 160 U.S.App.D.C. 351, 358-59, 492 F.2d 617, 624-25 (1974)).
 
 
 [76]
 See, e.g., Consolo v. FMC, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); Transamerica Trailer Transport, Inc. v. FMC, 160 U.S.App.D.C. 351, 359, 361, 492 F.2d 617, 625, 627 (1974)
 
 
 [77]
 For a discussion of how the substantial evidence and the arbitrary-or-capricious tests have converged, see K. Davis, Administrative Law Treatise Sec. 29.00-.01 (Supp.1976 and Supp.1980)
 
 
 [78]
 Approval of Agreement 10140-8, supra note 5, at 5 n. 10, reprinted in App. at 152 n. 10
 
 
 [79]
 Id. at 5 n. 10, reprinted in App. at 152 (citing Affidavit of C.J. Smith, reprinted in App. at 52)
 
 
 [80]
 Id. at 4 n. 9, reprinted in App. at 151 n. 9
 
 
 [81]
 Marine Space Enclosures, Inc. v. FMC, supra note 31, 420 F.2d at 588 (quoting United States Atlantic & Gulf Australia-New Zealand Conf. v. FMC, 124 U.S.App.D.C. 303, 306, 364 F.2d 696, 699 (1966))
 
 
 [82]
 The statements in the Secretary's affidavit were of the following nature:
 it is my firm and continued opinion that without Agreement 10140, the Gulf-United Kingdom Conference, the members of which provide all-water service, will be hard pressed to survive because the joint ocean/rail carrier parties to Agreement 10140 will find it difficult to resist meeting BSC's [Baltic Shipping Company's] rates on high value container cargo which, for them, is incremental traffic, but which is, for the all-water conference lines, their life's blood. Agreement 10140 serves to counteract such radical reaction to BSC rate practices by ... afford[ing] the opportunity for consideration of the drastic consequences imprudent and reckless use of such action may have on the all-water conference members and the long term interests of the trade as a whole.
 ....
 Succinctly stated, it is my opinion that the all water carriers wish to preserve and continue Agreement 10140 because it provides the only means at hand to deter the potential for ruinous rate cutting, massive instability and generally chaotic conditions in this tinder box trade.
 Affidavit of C.J. Smith (Jan. 20, 1978) at 9-10, reprinted in App. at 19-20.
 
 
 [83]
 Memphis Light, Gas & Water Div. v. FPC, 164 U.S.App.D.C. 156, 165, 504 F.2d 225, 234 (1974)
 
 
 [84]
 See generally D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 350 F.2d 753, 778-80 (1965)
 
 
 [85]
 Any reconsideration of the need for Agreement 10140 should also take into account the effect, if any, of the Ocean Shipping Act of 1978, Pub.L. No. 95-483, Secs. 2, 3, 92 Stat. 1607 (amending Shipping Act Secs. 1, 18, 46 U.S.C. Secs. 801, 817(c)(1)), which was enacted after the Commission's Order of Approval of August 30, 1978. The Act provides in part that a government-owned or controlled ocean carrier may not maintain rates that it cannot demonstrate to be "just and reasonable." The Commission recently disapproved rates of a Soviet-controlled carrier as unjustly and unreasonably low in Specific Commodity Rates of Far Eastern Shipping Company in the Philippines/U.S. Pacific Coast Trade, FMC Docket No. 79-104 (August 5, 1980). The Ocean Shipping Act may be relevant to any reconsideration here because the extent to which the Act deters Baltic Shipping Company's allegedly predatory practices will to that extent reduce the need the Commission has articulated for Agreement 10140
 
 
 [1]
 Carriers have been accused of exaggerating the probable effects of competition in their efforts to obtain governmental protection from it. See Mansfield, "The Federal Maritime Commission," in The Politics of Regulation (J. Wilson ed. 1980) 70 (detailing attempt by American carriers to obtain favorable legislation by overstating "Russian threat")
 
 
 [2]
 The Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. Sec. 10706(a), restricts the antitrust immunity for collective ratemaking by railroads formerly available under Sec. 5(b) of the Interstate Commerce Act, 62 Stat. 491 (1948). It directs the ICC to approve a collective ratemaking agreement among railroads only if it affirmatively finds that the agreement's benefits outweigh its anticompetitive effects. The ICC recently announced that a necessary component of such an affirmative funding is the demonstrated absence of more competitive alternatives. Net positive benefits, if capable of being achieved through less restrictive means, do not justify collective ratemaking under this interpretation of the statute. See Western Railroads--Agreement, 364 I.C.C. 31229, slip op. at 12-13 (June 27, 1980)
 
 
 [3]
 Report on Steamship Agreements and Affiliations by the House Committee on Merchant Marine and Fisheries, H.R.Doc. 805, 63d Cong., 2d Sess. (1914) ("Alexander Report"). This report laid the legislative groundwork for section 15
 
 
 [4]
 See Alexander Report, supra note 3, at 418 (steamship line witnesses not opposed to government "approval of all agreements or arrangements which steamship lines may have entered into with other steamship lines, with shippers, or with other carriers and transportation agencies"); 419-24 (recommendations that ICC approve "contracts entered into with other water carriers, with shippers, or with American railroads and other transportation agencies"; that the railroads be prohibited from making the through rail-and-water route unprofitable as compared to the all-rail route; that the ICC be empowered to compel railroads to allow competitive water carriers to apply effective differentials; and that the ICC have full supervisory power over divisions between railroad and water carriers as regards through rail-and-water rates)
 
 
 [5]
 This section is discussed in greater detail infra at text at notes 7-8
 
 
 [6]
 The Alexander Report seemed like a shaky foundation for asserting regulatory authority over intermodal rates to previous FMC chairmen; successive FMC chairmen testified in Congressional hearings in 1968, 1972 and 1976 that new legislation giving the Commission authority to regulate intermodal agreements was both necessary and desirable. See Hearings on H.R. 1080 Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries, 94th Cong., 2d Sess. 5 (Sept. 15, 1976) (statement of Karl Bakke, Chairman, FMC); Hearings on H.R. 15465 Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries, 92d Cong., 2d Sess. 22 (Sept. 18, 1972) (statement of Helen Bentley, Chairman, FMC); and Hearings on S. 3235 Before the Senate Comm. on Commerce, 90th Cong., 2d Sess. 30 (June 17, 1968) (statement of Rear Adm. John Harllee (ret.), Chairman, FMC). Cf. American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry. Co., 387 U.S. 397, 418 n.9, 87 S.Ct. 1608, 1619 n.9, 18 L.Ed.2d 847 (1967) (distinguishing present entitlement of motor carriers to use of railroad open tariffs for trailer-on-flatcar service from joint intermodal through rates permissible under proposed legislation.)
 
 
 [7]
 49 U.S.C. Sec. 10541 grants the ICC jurisdiction over transportation:
 (3) by water carrier or by water carrier and rail carrier or motor carrier between a place in the United States and a place outside the United States, to the extent that--
 (A) when the transportation is by rail carrier or motor carrier, the transportation is provided in the United States.
 (Emphasis supplied).
 
 
 [8]
 See Brief for the United States at 20-21 ("[I]f the water carriers agree on intermodal rates, .... the primary beneficiaries of any ICC regulation of the inland divisions would be the ocean carriers, and that agency's ability to protect the interests of the public would be frustrated.")
 
 
 [9]
 "Technological advances in an industry do not usually create problems of public policy; the price system will automatically bring about adjustments between the producers and consumers in the industry in accordance with the changed conditions. The noncompetitive and regulated nature of the ocean-shipping industry, however, inhibits these automatic adjustments. Substructures brought about by containerization and intermodal services have not been reflected in price changes, and these rigidities have created undesirable allocative effects
 
 
 [10]
 This concern manifested itself in the inclusion of provisions in the Shipping Act protective of the independents such as 46 U.S.C. Sec. 812 (prohibiting conferences' use of certain predatory practices) and 46 U.S.C. Sec. 814 (requiring conferences to admit all qualified carriers)
 
 
 [11]
 The proponents point out six incidents in which the "opting-out" provision of the agreement was utilized in 1976. In each, the resultant reductions were quite severe: $61.75 W/M to $45.75 W/M (synthetic yarn); $104 W to $82.50 W (corn cob ground); $112.75 W to $82.50 W (ground corn cob); $74.25 W/M to $37.25 W/M (home furnishings); $96.25 W to $60 W (orange juice); and $104.85 W to $60.00 W (grapefruit juice). J.A. 51 (Supplemental Affidavit of C.J. Smith). The proponents point to its limited usage as evidence of "the stabilizing influence of Agreement 10140." Id. However, one could view the same evidence as showing the successful elimination of competition and "independent action" in all but the most extreme cases
 
 
 [12]
 In Seatrain I and II, 189 U.S.App.D.C. at 390, 584 F.2d at 548; 194 U.S.App.D.C. at 371, 598 F.2d at 290, the FMC required that conference intermodal rates could only replace "comparable" individual carrier intermodal rates. This agreement goes one long step beyond that to allow the conferences to set the rates for individual carriers
 
 
 [13]
 At least one commentator has roundly criticized the FMC for its tendency to rubber-stamp conference agreements. See Mansfield, supra note 1, at 56-60
 
 
 [14]
 The FMC argues that the fact that no shippers have complained about the agreement is an indication of its merit. However, as the Department points out, shippers pass along their increased costs to their customers; no incentive to complain exists unless a shipper is being discriminated against vis-a-vis another shipper. Moreover, the lack of shipper involvement in FMC proceedings has been perceived as a serious, recurrent problem even by the officials of that agency. See id. at 64-68